CASE 77.—PROCEEDINGS BY C. S. MORELAND AGAINST
        THE CHESAPEAKE STONE CO TO CONDEMN A
        TRAMWAY.—October 11.

# Chesapeake Stone Co. v. Moreland

Appeal from Carter Circuit Court.

M. M. REDWINE, Circuit Judge.

From a judgment of the Circuit Court affirming a judgment of the County Court defendant appeals.— Affirmed.

1. Eminent Domain — Condemnation Proceedings — Judgment.— Under Acts 1904, p. 313, c. 126, section 3, relating to roads. and passageways, providing that appeals to the circuit court shall be tried de novo upon the confirmation of the report of the commissioners in the county court or the assessment of damages by that court, in the disposition of proceedings for the establishment of a private tramway over the property of another, the circuit court should enter a final judgment fixing the rights of the parties and awarding compensation, without reference to the action taken in the county court; but where the judgment of a county court defined with precision the rights of the parties, and awarded compensation to be paid before the tramway could be taken possession of, judgment of the circuit court on appeal that the appellee "is entitled to the tramroad adjudged by the C. county court, and the report of the reviewers therein is confirmed," is sufficient.

2. Same—Right to Take Property—Public Use.—Property is not taken for a public use unless the public has some right to use and enjoy the property taken, as distinguished from the absolute control of the individual; and an individual cannot for his own use take private property of another, however needful or convenient it may be, unless it is necessary to enable him to perform some public service; but, if the public

Chesapeake Stone Co. v. Moreland.

has the right to use it upon the same terms as the person at whose instance it was taken, it is a public use.

3. Same.—The fact that public interest will be promoted by a contemplated improvement will not, except in the case of mills, authorize the taking of private property, in the absence of the right on the part of the public to participate in the enjoyment of the property taken.

4. Same—Determination of Question as to Validity of Exercise of Power—Jurisdiction of Courts.—Whether a particular use is public or private is a question for the judiciary, and the courts have an undisputed right to determine whether the legislature has passed the limits provided by the Constitution, and that without reference to the character of the legislation enacted.

5. Constitutional Law—Statutes—Construction—Determination of Validity.—If there is doubt as to the validity of a statute, it will be upheld; and, if it is capable of two constructions, one of which will uphold and the other destroy it, that construction will be adopted which will uphold it.

6 Eminent Domain—Public Use—Private Tramway.—Acts 1904, p. 311, c. 126, amending Ky. Stats. 1903, section 4348, so that land may be condemned for a private tramroad to enable one to reach railroad switches, etc., for the purpose of marketing the products of certain quarries, etc., and providing that nothing in the act should be construed so as to give any person, etc., exclusive use of such passage, but that other persons, etc., should have the right to use the same upon paying proper compensation therefor, is not unconstitutional as taking property for other than public use, since others have the absolute right to use it upon the condition stated.

THEOBALD & THEOBALD for appellant.

The right of eminent domain is the right of a state or nation, or of those to whom the right and power has been lawfully delegated, to condemn private property for public use and to appropriate same for such use upon paying the owner just compensation to be ascertained according to law. West River Bridge Co. v. Dix, 6 Howard (U. S.), 507, 536; 12 Law Ed., 535. This being the full scope of the doctrine of eminent domain, the sovereign cannot exceed it or delegate any further right to take the private property of the citizen. Therefore, the legislature has no authority to grant to private or other persons the right to take private property for anything short of public use.

vol. 126—42

Chesapeake Stone Co. v. Moreland.

AUTHORITIES CITED.

Shake v. Frazier, 94 Ky., 143; First Lewis on Eminent Domain, 2d Ed., 158; Constitution of Ky., section 242; Highland Bay Gold Mining Co. v. Strickley, 28 Utah, 215; Shall v. Gorman Coal Co., 118 Ill., 427; Acts Ky. Legislature 1904, ch. 126, section 1; Ky. Stats., sections 4289, 4290.

HENRY L. WOODS for appellee.

· The act of the Kentucky legislature under which this proceeding was had, under chapter 126, Acts of the General Assembly of 1904 (see Acts 1904, p. 311), is not an act allowing the taking of private property for private use, as stated by appellant. But it is simply an act permitting a private person to condemn a right to use a part of another's land for certain purposes. In fact, it only gives an easement, and it may be used by any other person, and is not a private use at all, but a private person may condemn it for the use of himself and others. The act provides that it shall not operate so as to give any person, firm or corporation, exclusive use of said passage, but that any other person, firm or corporation, shall have the right to use it by paying compensation therefor, and if not agreed upon, then by condemnations proceedings."

OPINION OF THE COURT BY JUDGE CARROLL.—Affirming.

Appellee instituted a proceeding in the Carter county court in the manner provided by an act to amend an act relating to roads and passways, found in Acts 1904, p. 311, c. 126. The county court entered the following judgment: "It appearing to the satisfaction of the court from the report of the commissioners herein that it is necessary for the petitioner, C. S. Moreland, to have a private tramway over the lands of the said Chesapeake Stone Company to get her stone from her stone quarry to the Chesapeake & Ohio Railway Company's track, and that from said report, no other evidence being offered, $100 is a rea-

sonable compensation for the land to be taken for the same as hereinafter described and for any damage to adjacent land by reason of said private tramway, it is now ordered and adjudged that the said report of the commissioners be and the same is hereby confirmed; and it is further adjudged that the petitioner, C. S. Moreland, is entitled to the possession of the land as described by said commissioners: Beginning at a post in a wire fence between said Moreland's land and the land of the Chesapeake Stone Company (a stake); thence S. 58¼° W., 462 feet, to a stake; thence———61½° W., 203 feet, to a stake 50 feet north of the center of the Chesapeake & Ohio railway track; thence, beginning at the same wire fence and at a point N. 31¾° E., 20 feet from the first beginning point, at a stake; thence S. 58¼° W., running parallel with said first line, to a stake 50 feet north of the center of Chesapeake & Ohio railway track and to where it strikes the first line—said land being 20 feet in width. The possession of said land is to be for the use herein mentioned—that of a private tramroad. But it is adjudged that, before said land be taken by the petitioner for said purpose, said petitioner shall pay or offer to pay the said Chesapeake Stone Company the sum of $100 for the same.'' From this judgment the Chesapeake Stone Company prosecuted an appeal to the circuit court and filed in that court a transcript of the record made in the county court. This record was introduced as evidence, and a witness was introduced who testified that since the proceedings in the county court C. S. Moreland had sold the land upon which the tramway was to be located to the Norton Iron Works Company, reserving the roadway over the land so sold to be used for any purpose she desired. The land sold to the Norton Iron Works

Company is between the land of the Chesapeake Stone Company and the land originally owned by C. S. Moreland. There is a stone quarry on the land of C. S. Moreland, and also on that sold by her to the Norton Iron Works Company. No other evidence was introduced by either party. Thereupon the circuit court entered the following judgment: "This cause coming on for trial, and the court having heard all the evidence offered, and the argument of counsel, and being sufficiently advised, orders and adjudges that each and all of the motions and exceptions filed herein by appellant in the Carter circuit court on July 31, 1906, and in the Carter county court on March 3, 1906, be and they are hereby overruled, to which ruling of the court the appellant objected and excepted at the time said rulings were made; and it is adjudged by the court that the appellee, C. S. Moreland, is entitled to the tramroad adjudged by the Carter county court, and the report of the reviewers therein is confirmed. To which judgment of court appellant objected and excepted at the time."

The act provides that "either party may appeal to the circuit court by executing bond as required in other cases within thirty days, and the appeal shall be tried de novo upon the confirmation of the report of the commissioners in the county court or the assessment of damages by said court as herein provided." Section 3. The first objection made by appellant is that in a proceeding under this act the circuit court must do more than confirm the judgment of the county court, as was done in this case; that the proceeding must be determined in the circuit court without reference to what takes place in the county court, and judgment entered in the circuit court fixing or defining the rights of the parties and awarding compensation that

shall be paid for the tramway as ordered. It is said that the judgment of the circuit court does not fix or define the rights of the parties, or award compensation, but merely confirms the judgment of the county court. In the disposition of proceedings of this character the circuit court should enter a final judgment fixing the rights of the parties and awarding compensation, without reference to the action taken in the county court. But in substance and effect the circuit court entered as its judgment the judgment of the county court; and, as the judgment of the county court defined with precision the rights of the parties and awarded compensation to be paid before the tramway could be taken possession of, no question can arise as to the meaning and effect of the judgment of the circuit court. The argument of counsel for appellant that the circuit court did not award any compensation is not well taken, because the judgment of the county court, which was adopted by the circuit court, provides in terms that, "before said land shall be taken by the petitioner for said purpose, said petitioner shall pay or offer to pay said Chesapeake Stone Company the sum of $100." It is therefore clear that, under the judgment of the circuit court, appellee cannot take possession of the property until the compensation allowed has been paid.

A more serious question is presented in the contention that the act of 1904 is unconstitutional. Under the Revised Statutes adopted in 1852, when it was necessary for a citizen to have a private passway over the land of one or more persons in the county to enable him "to attend courts, elections, a meeting house, a mill or warehouse," he might have a passway condemned and established. The General Statutes adopted in 1873 added to the uses for which a private

passway might be established the right to condemn
to enable a citizen "to pass from one tract of land to
another owned by him, or to a railroad depot most
convenient to his residence." By subsequent acts
embraced in section 4348, Ky. St. 1903, ferries and
steamboat landings were included. By the act of 1904,
which is an amendment to section 4348 of the Ken
tucky Statutes of 1903, the uses for which private
ways might be condemned was again extended, so as
to allow the establishment of "a private tramroad
or haul road over the land of one or more persons to
enable him to reach a, warehouse, steamboat landing,
ferry, railroad switch, or navigable stream, for the
purpose of marketing the products of a lead mine,
iron works, salt works, coal mine, fire clay, and other
minerals, oil wells, stone quarry, sand bank, or mer-
chantable forest timber." This section also provides
that "nothing in this act shall operate to give any
person, firm or corporation exclusive use of such
passage; but any other person, firm or corporation
shall have the right to use the same upon paying
proper compensation therefor; if no agreement can
be made for such compensation, then the right to
such use may be condemned as herein provided." It
will thus be seen that the Legislature has gradually
been enlarging the uses for which private property
may be taken. Our Constitution does not define what
is "public use," merely providing in section 242 that
"municipal and other corporations and individuals
invested with the privilege of taking private property
for public use shall make just compensation for prop-
erty taken, injured or destroyed by them"; and this
provision was in substance in each of the preceding
Constitutions, and may be found in the Constitution
of nearly all the states of the Union.

Under these constitutional provisions it is said by Judge Cooley, in Constitutional Limitatons (page 503),"to be conceded on all hands that the Legislature has no power in any case to take the property of one individual and pass it over to another without reference to some use to which it is to be applied for the public benefit." There is, however, a difference of opinion held by the courts as to what constitutes a public use, some of them ruling that, if the public interest can be in any way promoted by the taking of private property, it must rest in the wisdom of the Legislature to determine whether the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of eminent domain, and to authorize an interference with the private rights of individuals for that purpose; in other words, holding that whatever is or may be beneficially employed for the community is a public use. On the other hand, numerous cases hold that to constitute a public use the property must be taken into the direct control of the public or public agencies, or the public must have the right to use in some way the property appropriated. Indeed, so conflicting are the authorities upon what constitutes a public use that Judge Cooley, in his Constitutional Limitations (page 766), deemed it proper to remark that "we find ourselves somewhat at sea, however, when we undertake to define in the light of judicial decisions what constitutes a public use"; and any person who undertakes to arrive at a satisfactory conclusion from an investigation of the authorities will find himself in the same condition as Judge Cooley.

Some of the courts hold that the establishment of of private roads or ways like the one here in question are deemed inhibited by constitutional provisions

similar to ours. Sholl v. German Coal Co., 118 Ill. 427, 10 N. E. 199, 59 Am. Rep. 379; Osborne v. Hart, 24 Wis. 89, 1 Am. Rep. 160; Wild v. Dieg, 43 Ind. 455, 13 Am. Rep. 399; Welton v. Dickson, 38 Neb. 767, 57 N. W. 559, 22 L. R. A. 496, 41 Am. St Rep 771. In others they are allowed. Latah County v. Peterson, 3 Idaho, 398, 29 Pac. 1089, 16 L. R. A. 81; Shearman v. Buick, 32 Cal. 241, 91 Am. Dec. 577. In the editorial notes to Beekman v. S. S. R. Co. (N. Y.) 22 Am. Dec. 686, and to Lynch v. Forbes (Mass.) 42 Am. St. Rep. 402, and Chicago R. R. Co. v. Morehouse (Wis.) 88 Am. St. Rep. 919, the authorities on this point are collected and commented upon. Indeed, the courts in several states seem to have adjudged the question in such manner as was best adapted to the needs and wants of the people. In discussing this question, Lewis on Eminent Domain, section 165, says: "Public use means use by the public; and this, it seems to us, is the construction the words should receive in the constitutional provision in question. The reasons which incline us to these views are, first, that it accords with the primary and more commonly understood meaning of the words; second, it accords with the general practice in regard to taking private property for public use in vogue when the phrase was first brought into use in the earlier constitutions; third, it is the only view which gives the words any force as a limitation, or renders them capable of any definite or practicable application. If the Constitution means that private property can be taken only for use by the public, it affords a direct guide for both the legislature and the courts."

This view seems to have been adopted by this court in the well-considered case of Robinson v. Swope, 12 Bush, 21, where it is said: "The citizen may occupy

and use his land in any lawful manner he chooses, subject only to the right of the public to take it upon consideration previously made for some public use; that is, to be occupied and enjoyed by the public, or for some use necessary to enable the public to command the services of citizens, or to enable the citizen to perform his duties to the public." And in this view we concur; our opinion being that the public must have some right to use and enjoy the property taken, as distinguished from the absolute control of the individual. In other words, an individual, for his own use and benefit, unless it be necessary to enable him to perform some public service, cannot take the private property of another, however needful or convenient to him the use might be. It seems entirely probable that only a few persons aside from the individual at whose instance it was established will have occasion to use this tramway; but this fact does not destroy its public use in the meaning of the Constitution. It is not the number of people who use the property taken under the law of eminent domain that constitutes the use of it a public one; nor does the fact that the benefits will be in a large measure local enter into the question. In short, according to the generally recognized rule, the length of the public way, the places between which it runs, or the number of people who use it, is not the essential inquiry. The controlling and decisive question is: Have the public the right to its use upon the same terms as the person at whose instance the way was established? If they have, it is a public use; if they have not, it is a private one. If the owner can exercise the same kind of dominion over it as he does over other property owned by him, if he can close it up, if he can prohibit all or any part of the public from its use, then it is clear

that its establishment would be private and not public; and the right of eminent domain could not be invoked in its creation. Nor is the fact that the public interest will be promoted by the contemplated improvement sufficient to authorize the taking, in the absence of the right on the part of the public to participate in the enjoyment of the property taken. If public use was construed to mean that the public would be benefited in the sense that the enterprise or improvement for the use of which the property was taken might contribute to the comfort or convenience of the public, or a portion thereof, or be esteemed necessary for their enjoyment, there would be absolutely no limit on the right to take private property. It would not be difficult for any person to show that a factory or hotel or other like improvement he contemplated erecting or establishing would result in benefit to the public, and under this rule the property of the citizen would never be safe from invasion.

Although our court has sustained the right to take private property when necessary to enable the citizen to perform a public duty or service, and to permit the establishment of mills, it has never sanctioned the taking for any other purpose, unless the public had a right to use the property taken. In fact, with the single exception of mills, the right of the individual to take property for an enterprise or improvement, in which the public had no rights other than those that flowed from the advantage they might enjoy from the conduct or operation of the property, has never been approved; and mills so erected have always been subject to legislative control and supervision (Ky. St. 1903, section 2721), the same as railroads and turnpikes, and upon this theory the taking of property for their establishment may be justified. In Robinson

v. Swope, supra, and in the later case of Shake v.
Frazier, 94 Ky. 143, 21 S. W. 583, 14 Ky. L. R. 798,
the provision of the statute allowing a passway to
be condemned so as to allow a citizen "to pass from
one tract of land to another owned by him," was con-
sidered by the court, and this part of the statute held
invalid upon the ground that it was taking property
for a purely private purpose. But the validity of so
much of the statute as allowed the establishment of a
passway to a steamboat landing, warehouse, ferry,
or railroad depot has never been called in question by
the courts, although it has been a part of the law of
the state for many years.

The acquiescence for so long a period of time in the
validity of these enactments is urged in support of
the argument that the courts of this State have
adopted the theory, prevailing in some jurisdictions,
that it is for the Legislature to say whether the use
is a public one or not, and that when it has authorized,
as in the case before us, the establishment of a road
by invoking the right of eminent domain, its judgment
is binding upon the courts. But the weight of
authority is decidedly against this view, and this
court, in Tracy v. E. L. & B. S. R. Co., 80 Ky. 259,
3 Ky. L. R 813, following the general current of
opinion, declared that whether a particular use is
public or not, within the meaning of the Constitution,
is a question for the judiciary Of the correctness of
this proposition we entertain no doubt. The courts
have the undisputed right to declare when the Legis-
lature has passed the limits provided by the Constitu-
tion, and this without reference to the character of
the legislation enacted. This no longer is an open
question in this State, and we do not deem it necessary
to cite authority in support of the proposition.

It is equally well settled that, if there is doubt as to the validity of the statute, it will be upheld; and if it be susceptible of two constructions, one of which would sustain it and the other destroy it, the courts will adopt that which will uphold the act, and we are disposed to give to legislation of the character here involved, where the right of the public in its use is not prohibited, but is permitted, a liberal construction, with a view to promote the public interest. In many portions of the State, where there are valuable mineral resources, it would seriously interfere with their development if the right to transport them to market was hindered or denied; and there can be little doubt that the public welfare will be advanced and promoted by furnishing every reasonable facility to owners of mines and quarries to put their products on the market. Every agency that helps to develop and build up the material resources of the State contributes to the good of all its people; and in many states influences of this character have induced the courts to adopt the view that whatever is or may be useful to the public is a public use, in the meaning of the Constitution. But the fact that the resources of mines and quarries are necessary for the public use will not in itself authorize the private owner in their development to take the land of the citizen for his individual use. While the courts will not shut their eyes to the necessity that exists for the development of the State, and will aid in every reasonable way the efforts of those who are trying to build it up, yet these considerations will not be permitted to destroy the ancient and valuable right that private property shall not be taken except for public use. The act in question goes to the very limit of legislative power and discretion. Under it is provided a means by which

the owner of land, upon which may be found coal, oil, gas, timber, or mineral of any character, may take land to enable him to carry the product to any of the natural or artificial highways of transportation. The only limitation upon the right of the individual to the exclusive use, operation, and control of the way is found in the provision that any other person desiring so to do shall have the right to its use upon paying reasonable compensation.  This is the only clause that saves the act from judicial condemnation. Giving to this provision the most liberal construction, it may be deemed to allow a use by the public of the way, although the person at whose instance it was taken opposes it; and hence it will be considered to have been taken for a public use, not upon the ground that the public will be benefited by the product gathered from the mine, well, or forest, but upon the ground that the public, or any number so desiring, may use the way.

For the reasons herein set forth, the judgment is affirmed.