## Spahn et al. v. Stewart et al.

(Decided Feb. 19, 1937.)

(As Extended March 26, 1937.)

WALLACE A. McKAY for appellants.

H. O. WILLIAMS and MARK BEAUCHAMP for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

The 1934 General Assembly enacted chapter 113, authorizing cities of the first class to create a Municipal Housing Commission for the purpose of improving internal conditions by carrying out a plan for the clearance of slums and to erect and maintain low cost houses in keeping with modern, sanitary, and safe methods.

The act and ordinance were so enacted and adopted that such cities might be entitled to the advantage of the provisions of Acts of Congress, extending to states and municipalities certain grants of money in furtherance of a purpose to better the standards of living.

Substantially the act provides that any city of the first class may establish an agency to investigate housing and living conditions; to plan and effectuate projects for the clearing of slum districts and to furnish instead reconstructed homes at reasonable rentals to persons of low incomes. The Commission is authorized to sell tax exempted bonds which are not to be obligations of the city, county, or state. Power of exercising the right of eminent domain is given the Commission.

It was also empowered after reconstruction, to rent the new habitations, applying the proceeds of such rentals to payment of interest on and for retirement of the bonds and obligations of the Commission; to provide a sinking fund to be applied to upkeep, necessary improvements, and for deterioration. Any surplus is to go to the sinking fund of the city for the meeting of its bonded or other governmental indebtedness. Under the act the Commission may be paid limited compensation for services, either in form of a salary or per diem.

Conceiving both the act and ordinance to be invalid, appellants filed petition in the lower court seeking to perpetually enjoin the Commission from proceeding further under the ordinance mentioned. Appellant Spahn owns property within the subjected boundary; Silk, another appellant is the owner of rental property outside the proposed boundary. Both are taxpayers and sue not only for themselves and others owning property within and without the boundary, but for all taxpayers of the city. The relief sought was denied by the lower court, demurrer to the petition being sustained, followed by dismissal upon a declination to plead further.

The pleadings fully state jurisdictional and other facts to the extent that a case is presented. The right of appellants to institute and prosecute such a suit is not challenged. The first contention of appellants is, that chapter 113 is void because it is in contravention of section 51 of the Constitution, which provides that no act shall relate to more than one subject, such subject to be expressed in the title, it being argued that there is nothing in the title of the act from which it might be inferred that there was to be extended the power of eminent domain, or that bonds were to be exempted from taxation. It is further asserted that the act undertakes to revise, amend, or extend existing laws without re-enacting such attempted revision or extension. We shall not quote the title; it may be observed by reference to Acts 1934, c. 113, p. 507. The substance of the act in terms has been set out above.

The title to the act in question is not vulnerable to the aimed criticism. We have time and again in meeting such objections held that all required by section 51 of the Constitution is that the contents of the act be so related to the title as to be clearly embraced within its

terms, or as it is sometimes expressed "germane." Kelley v. Hardwick, 228 Ky. 349, 14 S. W. (2d) 1098. The section of the Constitution supra, does not demand, nor is it intended thereby, that the title embrace a complete synopsis of the provisions of the act, nor that it set out details minutely. The title "need only indicate the general contents [purpose] and scope of the act, and if it gives reasonable notice thereof it is sufficient." Russell v. Logan County Board of Education, 247 Ky. 703, 57 S. W. (2d) 681, 683. The title of the act in question may be laid down by the side of the title of the act which was attacked on like grounds in Estes v. State Highway Commission, 235 Ky. 86, 29 S. W. (2d) 583, and the similarity (both of title and act) will be noted. In that case we held the title commensurate. The same may be said of Klein v. City of Louisville, 224 Ky. 624, 6 S. W. (2d) 1104. Reference is especially made to this court's opinion in the case of Talbott v. Laffoon, 257 Ky. 773, 79 S. W. (2d) 244, for a comprehensive exposition of the subject under discussion.

It is true that chapter 113, supra, comprises a diversity of details necessary to carry out its purpose and intent. These details do not differ materially from such as were contained in the acts involved in the cases mentioned above, the Estes and Klein Cases being exemplary. The title here is amply broad in scope to meet the requirements imposed by section 51 of the Constitution.

The act does not extend, revise, or amend any existing law. At the time of its passage there was no law on our statutes in reference to slum clearance or cheaper housing. It is true we had laws, both constitutional and statutory, with relation to the power to condemn property for public use, and the exemption of property from taxation, but the act in question did not undertake to nor did it amend, revise, or repeal any of these laws. City of Bowling Green v. Kirby, 220 Ky. 839, 295 S. W. 1004; Williams v. Raceland, 245 Ky. 212, 53 S. W. (2d) 370; Wheeler v. Board of Com'rs of Hopkinsville, 245 Ky. 388, 53 S. W. (2d) 740.

Appellants contend that chapter 113, Acts of 1934, is void, since it delegates legislative powers, in that the Commission is vested with power to determine the type, nature, character, and extent of the projects to be undertaken under the ordinance, as well as to determine

what properties may be acquired, the manner of acquirement and use, and to later control that use.

The two objections may be considered together and likewise answered. The act as we view it, does not delegate to the mayor of a city of the first class any legislative power. He is only given the power of appointment. This is not in any sense the exercise of more than the usual and ordinary executive power, such as filling any office created, by appointment in a lawful manner. Neither do we find that the Commission is vested with legislative power. We need not again enumerate its functions.

The conclusion that there is no delegation of legislative power may well be based on the opinion in Estes v. State Highway Commission, supra, wherein the court held valid the Toll Bridge Act (Acts 1928, c. 172), vesting powers in the Highway Commission to fix rates of toll, issue bonds and fix their maturities and terms on which bids should be made and contracts accepted. The court held that no sections of the Constitution were violated by the act, the power vested being purely administrative. This case cited with approval Hunter v. Louisville, 204 Ky. 562, 265 S. W. 277, which held valid an act creating a commission to construct a memorial building in Louisville; to make and enforce rules and regulations in the management of its affairs, and to conduct its businesss. Klein v. Louisville et al., 224 Ky. 624, 6 S. W. (2d) 1104, upheld an act authorizing the building of the municipal bridge, giving a commission power to fix tolls, regulate rates and issue and retire bonds. In Craig v. O'Rear, 199 Ky. 553, 251 S. W. 828, powers to certain agencies to select locations for teachers' colleges and other powers were delegated, and in this and all the cases cited, the court held that the acts were valid, since they did not delegate powers other than administrative, hence they did not contravene the sections of the Constitution there and here invoked. Counsel for appellant has pointed to no authority from this or any other court which would militate against our conclusion that the point made is unmeritorious. Other cases in this jurisdiction may be noted as follows: Bell's Committee v. Board of Education of Harrodsburg, 192 Ky. 700, 234 S. W. 311; Douglas Park Jockey Club v. Talbott, 173 Ky. 685, 191 S. W. 474; Lawrence County v. Fiscal Court, 191 Ky. 45, 229 S. W. 139.

There are other objections urged as being sufficient

to justify us in holding the act invalid. As we observe (and shall treat) them jointly and severally, it occurs that each and all inevitably turn upon the question as to whether or not the ultimate result sought constitutes a public use or purpose. A determination of this question will to all intents and purposes dispose of most, if not all of the objections forwarded, some of which are as follows:

"[a] The act and ordinance are both invalid because if carried into effect, the appellants and those for whom they speak will be deprived of their properties without due process of law, in contravention of the Fourteenth Amendment of the Constitution of the United States, and the bill of rights as set up in our Constitution [sections 1-26].

"[b] The condemnation of property as proposed under the empowering Acts cannot be legally effectuated because the purpose and intended use is not 'governmental.'

"[c] It is special or class legislation; for the benefit of one class of citizens to the exclusion of all others.

"[d] Neither the General Assembly nor the city possess the power to exempt from taxation the bonds issued by the Housing Commission to raise funds to carry out the project, because the purpose is not 'governmental.' " Ky. Const. secs. 171 and 174.

"A public purpose * * * has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within a given political division * * * the sovereign powers of which are exercised to promote such public purpose." Green v. Frazier, 44 N. D. 395, 176 N. W. 11, affirmed by the U. S. Supreme Court, 253 U. S. 233, 40 S. Ct. 499, 64 L. Ed. 878, see infra. See, also, Carman v. Hickman County, 185 Ky. 630, 215 S. W. 408; Barrow v. Bradley, 190 Ky. 480, 227 S. W. 1016; Barker v. Crum, 177 Ky. 637, 198 S. W. 211, L. R. A. 1918F, 673; Nourse v. City of Russellville, 257 Ky. 525, 78 S. W. (2d) 761.

The word "slum," harsh and objectionable to the æsthetic ear, has come to have a well-defined meaning, applicable to sections of almost every city or town of

proportions. It is usually taken to mean, "A squalid, dirty street or quarter of a city, town or village, ordinarily inhabited by the very poor, destitute or criminal classes; overcrowding is usually a prevailing characteristic. The word is comparatively recent and is of uncertain origin. It has been doubtfully connected with a dialectal use of the word 'slump' in the sense of a swampy, marshy place." Ency. Br. 25, 246. Brewer, "Phrase and Fable" says, "Slums are purlieus of Westminster Abbey &c. * * * where the derelict may obtain a night's lodging for a few pence." Although the word may be of comparatively recent origin, the matter of properly housing persons living in unclean, unsanitary houses in congested portions of cities, has been a subject of public concern for many years. The importance of proper housing had received public recognition in England for more than 100 years; in 1909 it had reached considerable proportions. The motive was first purely philanthropic and the objective was to improve the condition of the working classes. As early as 1841 there existed at least two societies, one the "Metropolitan Association for Improving the Dwellings of the Industrial Classes." These societies, after successfully operating for a time, found that from better housing the moral improvement was almost "equal to the physical benefit." Legislation looking to the same end soon followed and has at intervals continued to the present time. Encyc. Br. vol. 13, p. 815. The requirements of public health are indeterminate and interminable; as knowledge increases, standards of living, of health, and of safety constantly rise. It is the changing of standards which gives most concern; housing at one period thought eminently satisfactory is presently condemned. In the present age, as in the past, material conditions of environment takes a leading position. These truths are recognized just as strongly in this, as in other countries which have outstripped ours in looking to the welfare of those whose conditions of life might be bettered by a more healthful surrounding. Encyc. Br. under title "Housing."

In 1933, under a survey of the city of Louisville, including the territory selected for the purposes here, conditions existed worthy of consideration and action. The number of tubercular patients in the selected area bore the average proportion of 1 to 187 inhabitants; whereas the ratio in the whole city was 1 to 463. The

ratio of major crimes committed in the spotted area was 1 to 63, while in the total area it was 1 to every 171; in minor derelictions 1 to 82, and 1 to 129; in juvenile delinquencies 1 to 50 as against 1 to 182.

It takes little argument, if such conditions as are described exist, and no doubt they do, to convince one that there is presented a situation which has not been ameliorated in the past by those who own and control the properties, though aided by such safety and welfare measures as have been thus far adopted, and to some extent carried into effect by state and municipal governments. The solution of the problem calls for action in some way that may prove more efficacious.

The General Assembly in empowering the city to undertake the clearance plan, declared the plan to involve "objects essential to public interest." Its conclusions are not at all binding, but they may be given considerable effect. They may be looked upon as being persuasive. New York City Housing Authority v. Muller, 270 N. Y. 333, 1 N. E. (2d) 153, 156, 105 A. L. R. 905. The opinions of legislative bodies are entitled to respect. Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165; People v. Charles Schweinler Press, 214 N. Y. 395, 108 N. E. 639, L. R. A. 1918A, 1124, Ann. Cas. 1916D, 1059.

The necessity, expediency, and propriety of enacting measures looking to the end here hoped for, are of general interest, the policy vested solely in legislative bodies. "The motives that influenced it [the action] will not be inquired into, except in rare cases, where it is manifest that a flagrant wrong had been perpetrated upon the public." Henderson v. City of Lexington, 132 Ky. 390, 111 S. W. 318, 323, 33 Ky. Law Rep. 703, 22 L. R. A. (N. S.) 20; First National Bank of Paducah v. Paducah, 202 Ky. 48, 258 S. W. 938; Louisville & N. R. Co. v. Louisville, 131 Ky. 108, 114 S. W. 743, 24 L. R. A. (N. S.) 1213; Id., 190 Ky. 214, 227 S. W. 160.

The question of the necessity for the exercise of eminent domain is one primarily and almost exclusively, addressed to the legislative branch, while the question of whether or not the use to which the proposed condemned property be put is a public use or purpose, is one to be determined by the judiciary. Tracy v. Elizabethtown, L. & B. S. R. Co., 80 Ky. 259; Henderson v. City of Lexington, supra; First Nat. Bank v. Paducah,

supra. In carrying out that part of the administration of government, this court has not infrequently been called upon to determine the question of use, and has held that the power to condemn was rightfully conferred in many cases where the purpose was not as far reaching or as beneficial as it may prove to be here. A tramway, Chesapeake Stone Co. v. Moreland, 126 Ky. 656, 104 S. W. 762, 31 Ky. Law Rep. 1075, 16 L. R. A. (N. S.) 479; a pipe line, Paine's Guardian v. Calor Oil & Gas Co., 133 Ky. 614, 103 S. W. 309, 31 Ky. Law Rep. 754, 11 L. R. A. (N. S.) 727, 134 Am. St. Rep. 475; railroad rights of way, Riley v. Louisville, H. & St. L. R. Co., 142 Ky. 67, 133 S. W. 971, 35 L. R. A. (N. S.) 636, Ann. Cas. 1912D, 230; drainage ditches, Carter v. Griffith, 179 Ky. 164, 200 S. W. 369.

In some of the earlier cases, e. g., Chesapeake Stone Co. v. Moreland, supra, a narrow view of the words "public use" was expressed. This view was somewhat extended in Carter v. Griffith, supra, which was an undertaking by condemnation to take private property for the use of constructing a drainage canal. The court therein indicated that a benefit to public health was not the sole purpose for which property might be acquired by condemnation for ditch purposes, but that the reclamation of low and swampy lands for agricultural and other economic purposes, brought the exercised power within the scope of governmental functions.

In this case quoting from Wilson & Co. v. Compton Bond & Mortgage Company, 103 Ark. 452, 146 S. W. 110, 112, we said:

"Nor is it necessary that the entire state should directly enjoy or participate in an improvement of this nature in order to constitute it a 'public use' within the meaning of the words as used in our Constitution or the federal Constitution, providing that property shall not be taken without consent of the owner except for public use. In the broad and comprehensive view that has been taken of the rights growing out of these constitutional provisions, everything which tends to enlarge the resources and promote the productive power of any considerable number of the inhabitants of a section of the state contributes, either directly or indirectly, to the general welfare and the prosperity of the whole community, and therefore to the public."

In Louisville & N. R. Co. v. Louisville, 131 Ky. 108, 114 S. W. 743, 748, 24 L. R. A. (N. S.) 1213, we said:

"It is probable that in every case where the right of eminent domain is exercised private interests will be more or less benefited; but the existence of this fact will not be allowed to defeat the benefits that will accrue to the public."

In Rindge Co. v. Los Angeles County, 262 U. S. 700, 43 S. Ct. 689, 693, 67 L. Ed. 1186, condemnation of land for a road which appeared to serve no public purpose in so far as reaching one point from another was concerned, was upheld because, "A road need not be for a purpose of business to create a public exigency; air, exercise and recreation are important to the general health and welfare; pleasure travel may be accommodated as well as business travel; and highways may be condemned to places of pleasing natural scenery." See Cooley Const. Lim. (8th Ed.) vol. 2, p. 1131; Strickley v. Highland Boy Gold Mining Co., 200 U. S. 527, 26 S. Ct. 301, 50 L. Ed. 581, 4 Ann. Cas. 1174; Green v. Frazier, 253 U. S. 233, 40 S. Ct. 499, 64 L. Ed. 878; Block v. Hirsh, supra; Marcus Brown Holding Co. v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. Ed. 877; Green v. Frazier, supra, is of fitting application here. It had to do with a Home Building Act (Laws N. D. 1919, c. 150). The contention was that the act was contrary to both the State and Federal Constitution. The Supreme Court upheld the favorable decision of the North Dakota Supreme Court. See also, Willmon v. Powell, 91 Cal. App. 1, 266 P. 1029; Village of Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016; Tenement House Department v. Moeschen, 179 N. Y. 325, 72 N. E. 231, 70 L. R. A. 704, 103 Am. St. Rep. 910, 1 Ann. Cas. 439; New York Health Dept. v. Rector, etc., of Trinity Church, 145 N. Y. 32, 39 N. E. 833, 27 L. R. A. 710; Adler v. Deegan, 251 N. Y. 467, 167 N. E. 705, 711, in which Justice Cardozo concurring, said:

"The Multiple Dwelling Act is aimed at many evils, but most of all it is a measure to eradicate the slum. It seeks to bring about conditions whereby healthy children shall be born, and healthy men and women reared. * * * The end to be achieved is more than the avoidance of pestilence or contagion. * * * If the moral and physical fiber of its manhood and its

womanhood is not a state concern, the question is, what is? Till now the voice of the courts has not faltered for an answer."

The use here proposed, as argued by appellee and admitted by appellants, may be more beneficial in the way of direct aid to a particular class, but it also operates to the benefit of the general public and its welfare. The act limits the ultimate use of the improved property to such persons as may be selected to occupy. This does not brand the purpose as class or special legislation. Whether or not the persons chosen to occupy are to be ultimately benefited more than those who are not, is a sociological question because of differing circumstances. Who can say that in the long run those who live in sumptuous residences environed by the elite may not account themselves still more blessed, if by improved conditions of housing in another section they are relieved from the probabilities or possibilities of an epidemic of smallpox, typhoid fever, or other diseases, or that they may sleep more serenely because of a lessened fear of the commission of crime against their persons or property. "The essential purpose of the legislation is not to benefit that class or any class; it is to protect and safeguard the entire public from the menace of the slums." New York City Housing Authority v. Muller, supra. The fact that all individuals may not be elected to occupy the reconditioned premises is not material. A power plant, because of limited equipment, may not be able at all times to serve all the public but it is none the less rendering public service. It is not essential to the validity of the proposal that all the public reap like direct benefits. Rindge Co. v. Los Angeles County, supra; Fallbrook Irrigation Dist. v. Bradley, 164 U. S. 112, 17 S. Ct. 56, 41 L. Ed. 369. The fact that those who may ultimately occupy the premises may have a preference is immaterial. Long Island Water-Supply Company v. Brooklyn, 166 U. S. 685, 687, 17 S. Ct. 718, 41 L. Ed. 1165. It is not material that some reap more benefit than others. Strickley v. Highland Boy Gold Mining Company, supra; Mt. Vernon-Woodberry Cotton Duck Company v. Alabama I. P. Co., 240 U. S. 30, 36 S. Ct. 234, 60 L. Ed. 507. Nor is the government competing with private enterprise. Green v. Frazier, supra; Madera Waterworks v. Madera, 228 U. S. 454, 33 S. Ct. 571, 57 L. Ed. 915; Knoxville Water Co. v. Knoxville, 200 U. S. 22, 26 S. Ct. 224, 50 L. Ed. 353;

Springfield Gas & Electric Co. v. Springfield, 257 U. S.
66, 42 S. Ct. 24, 66 L. Ed. 131.

The bonds proposed are to be issued to retire 55
per cent. of the total cost of the project. These bonds
do not obligate the state, the county of Jefferson, nor
the city of Louisville. They are payable, maturities and
interest, from the revenues to be acquired from the
rentals of the rehabilitated properties, secured by a first
and prior lien on the properties. The plan of meeting
the obligations in no material sense differs from plans
which have heretofore been approved with regard to the
building of interstate and intrastate toll bridges, financ-
ing certain educational institutions in the expanding
and improvement of their properties, or in providing
more adequate facilities for caring for tubercular pa-
tients, all under acts not dissimilar to the one in ques-
tion. See Hughes v. State Board of Health, 260 Ky.
228, 84 S. W. (2d) 52; Williams v. Raceland, 245 Ky.
212, 53 S. W. (2d) 370; Wheeler v. Board of Com'rs of
Hopkinsville, 245 Ky. 388, 53 S. W. (2d) 740; Estes v.
State Highway Commission, supra; Bloxton v. State
Highway Commission, 225 Ky. 324, 8 S. W. (2d) 392;
Klein v. Louisville, supra; J. D. Van Hooser & Co. v.
University of Kentucky, 262 Ky. 581, 90 S. W. (2d)
1029.

On both the dominant contentions here urged we
are much persuaded by the able opinion of Justice
Crouch of the New York Court of Appeals in New York
City Housing Authority v. Andrew Muller et al., supra.
The act there questioned was similar to the act here
attacked. Only two contentions were urged, or at least
considered by the court, and these two are common to
the case here, i. e., power to condemn and exemption of
the bonds from taxation. Both, there as here, turned
on the question as to whether the intended use of the
property was or is of such public nature as to permit
the condemnation and exemption in the face of a simi-
lar state constitutional prohibition, and the Fourteenth
Amendment to the Constitution of the United States.
We quote:

"Slum areas are the breeding places of disease
which may take toll not only from denizens, but, by
spread, from the inhabitants of the entire city and
state. Juvenile delinquency, crime, and immorality
are there born, find protection, and flourish. Enor-

mous economic loss results directly from the neces-
sary expenditure of public funds to maintain health
and hospital services for afflicted slum dwellers and
to war against crime and immorality. * * * Con-
cededly, these are matters of state concern [Adler
v. Deegan, 251 N. Y. 467, 477, 167 N. E. 705]. * * *
Time and again, in familiar cases needing no cita-
tion, the use by the Legislature of the power of
taxation and of the police power in dealing with the
evils of the slums, has been upheld by the courts.
Now, in continuation of a battle, which if not en-
tirely lost, is far from won, the Legislature has re-
sorted to the last of the trinity of sovereign powers
by giving to a city agency the power of eminent
domain.''

Quoting from In re Ryers, 72 N. Y. 1, 28 Am. Rep.
88, the New York Court said:

'' 'To take * * * for the * * * promotion of the
public health, is a public purpose.' * * * Over many
years and in a multitude of cases the courts have
vainly attempted to define comprehensively the con-
cept of a public use and to formulate a universal
test. They have found here as elsewhere that to
formulate anything ultimate, even though it were
possible, would, in an inevitably changing world, be
unwise if not futile. Lacking a controlling prece-
dent, we deal with the question as it presents itself
on the facts at the present point of time. * * * It
is also said that since the taking is to provide
apartments to be rented to a class designated as
'persons of low income,' or to be leased or sold to
limited dividend corporations, the use is private
and not public. This objection disregards the pri-
mary purpose of the legislation. Use of a proposed
structure, facility, or service by everybody and
anybody is one of the abandoned universal tests of
a public use. Mt. Vernon-Woodberry Cotton Duck
Co. v. Alabama I. P. Co. * * *; Strickley v. High-
land Boy Gold Mining Co. * * *; Rindge Co. v. Los
Angeles County * * *; Fallbrook Irrigation Dis-
trict v. Bradley * * * [all supra].''

In commenting on the New York case (270 N. Y.
333, 1 N. E. (2d) 153, 105 A. L. R. 905) we do not over-
look U. S. v. Certain Lands (C. C. A.) 78 F. (2d) 684,
687, or U. S. v. Certain Lands (D. C.) 12 F. Supp. 345,

and Id. (D. C.) 9 F. Supp. 137, in which the Circuit Court of Appeals held that the federal government could not enter a state and condemn lands for housing purposes because, "The state and federal governments are distinct sovereignties," and "what is a public use under one sovereign may not be a public use under another." In short, the court apparently of the opinion that the use was for public purposes, held that the federal government could not condemn private property except for purely federal governmental purposes. The Attorney General of the United States recognized the propriety of these opinions, since certiorari in each was dismissed on his motion in the United States Supreme Court. The objectionable feature was abandoned by a more recent act of Congress. U. S. C. A. title 40, sec. 421.

From what we have said above it is discernible that the property intended to be acquired here by condemnation, if such become necessary, is to be used for a public purpose. It follows that such condemnation, if undertaken, will not violate either the Fourteenth Amendment to the Federal Constitution or any section of our own, assuming that just compensation be made to owners. This conclusion we think should dispose of the contention that the bonds issued in furtherance of the project cannot be exempted from taxation. If the purpose is public, they are in express terms exempted by provisions of our Constitution. We have had this question in perhaps other forms before us not infrequently, and have consistently held that where the bonds are to be issued in furtherance of a public purpose the evidence of debt stands in the same light as other public property. Some of the cases where the contention of appellant has been adversely determined may be noted. Com. v. Covington, 128 Ky. 36, 107 S. W. 231, 32 Ky. Law Rep. 837, 14 L. R. A. (N. S.) 1214; Com. v. Newport, 107 S. W. 232, 32 Ky. Law Rep. 820; City of Covington v. District of Highlands, 110 S. W. 338, 33 Ky. Law Rep. 323; District of Highlands v. Covington, 164 Ky. 815, 176 S. W. 192; City of Harlan v. Blair, 251 Ky. 51, 64 S. W. (2d) 434; Estes v. State Highway Com., Bloxton v. State Highway Com., Klein v. City of Louisville, all supra. These cases and those added below, dispose of the contention that since the Housing Commission is merely an agency of the city, the bonds are obligations of the city, this notwithstanding the act

and resolution distinctly provide otherwise. Board of Education v. City of Paducah, 108 Ky. 209, 56 S. W. 149, 21 Ky. Law Rep. 1650; Board of Education of Bowling Green v. Townsend, 140 Ky. 248, 130 S. W. 1105; Klein v. City of Louisville and Hunter v. City of Louisville, both supra.

It is contended that the resolution and ordinance are invalid because in such contracts as the Housing Commission may make, certain prescribed wages for labor are to be paid and the laborers to be limited to so many working hours. This provision in the resolution is there placed because it is a condition upon which the grant of financial aid is proffered by the government. It is said the resolution is contrary to public policy and violates such parts of the act of 1934 (section 4, c. 113) as require that all contracts be let upon competitive bidding to the best bidder. Two principal features of the act must be considered: One, that the act has as one of its outstanding purposes the procurement of financial aid from the government; second, that the work contemplated is of a public nature, as we think we have sufficiently pointed out. The work done in the consummation of the plan is essentially public work. A distinction as between liberty in contracting where private enterprise or public work is concerned, was recognized by the Supreme Court in Morehead v. People of New York ex rel. Tipaldo, 298 U. S. 587, 56 S. Ct. 918, 80 L. Ed. 1347, 103 A. L. R. 1445.

Our General Assembly, ready to accept the benefit of the national laws offering grants in aid of public enterprises, began in 1934 to take advantage of such offers. In that year the Assembly enacted chapter 68, 69, 72, and 113, and at an Extraordinary Session in the same year, chapters 14 and 15 were enacted. Each and all adopted for the purpose of aiding municipalities in obtaining federal aid in the erection of public buildings; these may be, as some of them were termed, "Financial Distress Acts." The last two chapters, supra, extended to counties the authority to obtain relief in the erection of adequate public school quarters. By these acts the Assembly has determined and announced a definite policy in relation to conditions upon which aid may be accepted and applied in the erection of public buildings. The general plan provided in chapters 68 and 69 was approved in Davis v. Board of Education of Newport, 260 Ky. 294, 83 S. W. (2d) 34. Chapters 14 and 15 were

approved in the case of Roberts v. Fiscal Court of Graves County (denying an injunction). Chapter 72 was approved in Van Hooser & Co. v. University of Kentucky, 262 Ky. 581, 90 S. W. (2d) 1029. Likewise, the general plan was approved in Hughes v. State Board of Health, 260 Ky. 228, 84 S. W. (2d) 52, 54, authorizing the improvement and expansion of Waverly Sanitorium on a plan similar to the one here.

It is well settled that when the Legislature delegates a power to a municipal corporation, that body has the implied right to select the means by which the purpose may be accomplished, provided always that the adopted means do not transcend any constitutional inhibition. Overall v. Madisonville, 125 Ky. 684, 102 S. W. 278, 31 Ky. Law Rep. 278, 12 L. R. A. (N. S.) 433; Marz v. Newport, 173 Ky. 147, 190 S. W. 670; City of Springfield v. Haydon, 216 Ky. 483, 288 S. W. 337; Simrall v. McKenna, 195 Ky. 580, 242 S. W. 587; Reconstruction Finance Corp. v. Richmond, 249 Ky. 787, 61 S. W. (2d) 631; 19 R. C. L. 768; 43 C. J. 190, p. 193.

There is no avoidance of competitive bidding here. We have defined "competitive bidding" to be such as "requires that all bidders be placed on a plane of equality, and that they bid upon the same terms and conditions." State Highway Commission v. King, 259 Ky. 414, 82 S. W. (2d) 443, 450. "Competitive bidding means that the council must by due advertisement give opportunity for every one to bid." Blanton v. Town of Wallins, 218 Ky. 295, 291 S. W. 372, 375. In City of Springfield v. Haydon, supra, we upheld a contract let on bid, in which the proposal called for a material possible of being furnished by only one concern in the entire country, saying that there is competitive bidding "unless the advantage, by its terms, excludes other bidders." Gathright v. Byllesby & Co., 154 Ky. 106, 133, 157 S. W. 45, 57. In the case of Denton v. Carey-Reed Co., 169 Ky. 54, 183 S. W. 262, 263, where only one bid was received for street reconstruction, we held that the contract was valid since there was a reasonable bid, "fairly made at a public letting, legally advertised and open to all." Appellants, or any party feeling aggrieved at any action taken by the commission in attempting to let proposed contracts, may in a proper proceeding raise any question of unfairness or illegal procedure.

The question here presented has arisen in courts of other jurisdictions, to decisions of which we may point for authority for our conclusion that the resolution is in keeping with the act, and is not contrary to its terms, or contrary to public policy. We refer to City of Milwaukee v. Raulf, 164 Wis. 172, 159 N. W. 819; Wagner v. Milwaukee, 177 Wis. 410, 188 N. W. 487; Jahn v. Seattle, 120 Wash. 403, 207 P. 667; Malette v. Spokane, 77 Wash. 205, 137 P. 496, 51 L. R. A. (N. S.) 686, Ann. Cas. 1915D, 225; Interstate Power Co. v. Cushing (D. C.) 12 F. Supp. 806; Iowa Southern Utilities Co. v. Lamoni (D. C.) 11 F. Supp. 581; Norris v. City of Lawton, 47 Okl. 213, 148 P. 123. These relate mainly to fixing of wage scale. The time schedule is upheld in Atkin v. Kansas, 191 U. S. 207, 24 S. Ct. 124, 48 L. Ed. 148; Jahn v. Seattle, supra; People v. Orange County Road Construction Co., 175 N. Y. 84, 67 N. E. 129, 65 L. R. A. 33; Norris v. Lawton, supra; Heim v. McCall, 239 U. S. 175, 36 S. Ct. 78, 60 L. Ed. 206, Ann. Cas. 1917B, 287; Cornelius v. Seattle, 123 Wash. 550, 213 P. 17, and in Ebbeson v. Board of Education of Wilmington, 18 Del. Ch. 37, 156 A. 286, it was held not to be a violation of the Constitution or any statutory law to give preference in employment to citizens of the state, where the employment was on public works. The provisions of chapter 113 directing competitive bidding in no wise prohibits the Commission from stipulating that bidders shall comply with a wage and labor scale set up by the Commission. To interpolate such an inhibition, as herein suggested by appellants, would require us to disregard the paramount purposes and intent of the act.

Nor is there any delegation of the powers of the state, the municipality, or the Commission to the Federal Government. The commissioners in all things required by the act are free to conduct the scheme of furnishing low-cost housing, without interference by the government. It may be presumed that the Commission has thus far exercised its free will and choice, and will continue to do so, even to the extent of accepting the government's proffer. It may so exercise its will in the acceptance or rejection of bids. The matter of contracting is one arising between the Commission and bidders. There is no attempt by the national government to control legislative functions, either of the state or municipality. When we say that the Legislature may not delegate its powers, we mean that it may not delegate the

exercise of discretion as to what a law shall be, but not that it may not confer discretion in the administration of the law itself. Craig v. O'Rear, 199 Ky. 553, 251 S. W. 828; Douglas Park Jockey Club v. Talbott, 173 Ky. 685, 191 S. W. 474.

Lastly, appellants contend that since section 4 of the act limits expenditures to the proceeds of the operation of the project, the Commission may not at the city's expense proceed with survey and mapping plans, and we assume, pay no salaries or expenses of the Commission except out of the money arising from rentals. We do not so construe the act. It is provided that the Commission shall not proceed to exercise the power given it to bind the Commission beyond the extent to which money has been provided under "the authority of this act." The act gives the city the power to fix and pay salaries to the Commission and to defray preliminary expenses. The resolution passed by the council did these things. The purpose being a public one, as we have shown, we see nothing in the act which would prevent the city from providing for compensation and necessary expenses of the Commission. There is shown no attempt on the part of the Commission to contract for or expend any money "which has not been [or may not be] provided under the Act."

From a careful survey of the record, we are of the opinion that the act, the ordinance and the resolution are not out of harmony with any fundamental laws or statutory provisions, hence conclude that the court below properly sustained the demurrer and dismissed appellants' petition.

Affirmed.

The whole court sitting.