**LOUISVILLE METRO HOUSING AUTHORITY, Appellant,**

v.

**Julius BURNS, A Minor, by his Next Friend, Donna Burns, Mother, Appellee.**

No. 2004–CA–001489–MR.

Court of Appeals of Kentucky.

Oct. 28, 2005.

Discretionary Review Denied by Supreme Court Aug. 17, 2006.

K. Gregory Haynes, Virginia Hamilton Snell, C. Tyson Gorman, Lisa C. DeJaco, Wyatt, Tarrant & Combs, LLP, Louisville, KY, for Appellant.

Glenn A. Cohen, Paul J. Hershberg, Seiller · Handmaker, LLC, Louisville, KY, for Appellee.

Before KNOPF and TACKETT, Judges; ROSENBLUM, Senior Judge.[1]

### OPINION

ROSENBLUM, Senior Judge.

The Louisville Metro Housing Authority appeals from a judgment based upon a jury verdict awarding appellee Julius Burns $500,000.00 in compensatory damages and $3,000,000.00 in punitive damages stemming from injuries he sustained through exposure to lead in and about the Authority's public housing complex in which he resided throughout his childhood. The Authority advances two arguments for reversal: 1) that the trial judge erred in allowing the issue of punitive damages to be presented to the jury; and 2) that the compensatory damage award was predicated solely upon impermissible speculation as to appellee's loss of future income. Although we find no error in evidence adduced to support the compensatory damage verdict, we are convinced that it was error to allow the issue of punitive damages against a taxpayer-funded government agency to be presented to the jury.

In 1990, appellee's family moved into the Authority's housing at 621 East St. Catherine Street in Louisville, Kentucky, property which consisted of two apartment buildings separated by a grassy yard. In 1993, when Julius was two and one-half years old, it was determined in the course of routine Health Department testing that he had an elevated level of lead in his blood. Subsequent testing at the apartment complex revealed the presence of lead in the older of the two buildings and in the soil surrounding the buildings. In 1999, Julius filed this action against the Authority alleging that exposure to lead at the property caused him to suffer mental retardation and attention deficit hyperactivity disorder. He sought damages to compensate him for mental and physical pain and suffering, loss of future income and the cost of future care, as well as punitive damages. The trial judge initially concluded that the Authority was an agency of the City of Louisville which was afforded immunity against the punitive damage claim by operation of KRS 65.200 et seq., the Claims Against Local Governments Act. However, prior to trial on the

1. Senior Judge Paul W. Rosenblum sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

remainder of Julius's complaint, the trial judge reconsidered her previous ruling and reinstated the punitive damage aspect of the claim in light of the opinion of the Supreme Court of Kentucky in *Phelps v. Louisville Water Company,* 103 S.W.3d 46 (Ky.2003), which held that KRS 65.200 *et seq.* did not preclude imposition of punitive damages against the Louisville Water Company because it failed to meet the criteria necessary to categorize it as an agency of the City of Louisville.

The case thereafter proceeded to trial and the jury was instructed on appellee's theories of common-law negligence, fraud and gross negligence. Although the jury found for the Authority on the fraud claim and made no award for pain and suffering or for the cost of future care, it awarded appellee $500,000.00 on his negligence claim for loss of future income plus $3,000,000.00 in punitive damages. In its appeal from the judgment based upon that verdict, the Authority focuses primarily upon the trial judge's determination that its situation with respect to punitive damages cannot be distinguished from that of the Louisville Water Company in *Phelps.* Having reviewed the analysis by which the Supreme Court reasoned that the Louisville Water Company was not an agent of the city and could not therefore avail itself of the protections afforded local governments in KRS 65.2002, we are persuaded that public policy considerations concerning the very nature and purpose of the housing authority removes it from the *Phelps* rationale.

■ Utilizing agency criteria, the Supreme Court concluded that the absence of the essential element of control over the Louisville Water Company precluded application of the KRS 65.200–2002 protection against awards of punitive damages. Of particular relevance to the Authority's position in this appeal, the *Phelps* court

further refined its holding with respect to agency status by focusing upon responsibility for payment of punitive damage awards:

> The City does not exercise control over LWC's fiscal matters and any losses incurred by LWC are not imputed to the City and its taxpayers. This is further evidence that the legislature did not intend the LWC to operate as an agent of the City of Louisville.

103 S.W.3d at 51. It is clear that the same cannot be said of the Metro Housing Authority.

In *City of Louisville v. German,* 286 Ky. 477, 150 S.W.2d 931, 933–34 (1940), the origins and purpose of the housing authority are summarized as follows:

> The municipal housing commission was created under what is known as the Municipal Housing Commission Act, Kentucky Statutes, section 2741x–1 et seq. The purpose of that act was to promote slum clearance by acquiring, establishing, erecting, maintaining, and operating low cost housing projects in municipalities of the first and second class. In *Spahn v. Stewart,* 268 Ky. 97, 103 S.W.2d 651, 659, the act was held valid and constitutional. The purposes of the act are fully set forth in that opinion and among other things it is said: "Two principal features of the act must be considered: One, that the act has as one of its outstanding purposes the procurement of financial aid from the government; second, that the work contemplated is of a public nature, as we think we have sufficiently pointed out. The work done in the consummation of the plan is essentially public work."

The current version of the enabling legislation for the Authority, KRS 80.020, plainly outlines the extent of its authority:

> Cities of all classes may acquire, establish, and operate, within their limits,

housing, under the provisions of this chapter, for the purpose of providing adequate and sanitary living quarters for individuals or families, such housing to be for individuals or families with low or moderate income or for individuals or families having income in excess of low or moderate if such housing is acquired, established and operated in conjunction with, and located within one (1) mile of housing for individuals or families with low or moderate income. *They may create city housing authorities, and they and the authorities created by them shall have all powers necessary and appropriate to engage in such housing and slum clearance projects, including, without limitation, all power specified in KRS 80.500 and the power in connection with the use of federal funds* . . . . [Emphasis added.]

KRS 80.500 defines "housing authority" as constituting "a public body corporate and politic, exercising public and essential governmental functions, and having all the powers necessary or convenient to carry out and effectuate the purposes and provisions of KRS 80.320 to 80.610 . . . ." Housing authorities are included within the definition of "public body" set out in KRS 80.010(3).

Unlike the Louisville Water Company, which is a for-profit corporation whose revenue is derived from its customers, the Authority is a non-profit entity which receives income from three sources: the United States Department of Housing and Urban Development, the City of Louisville and, to a limited degree, its tenants. It was created by the City of Louisville as its repository for federal funds and as the entity through which the City would exercise its purely governmental function of providing low cost housing. Review of the statutory framework under

which the Authority was created provides ample evidence as to legislative intent with respect to its status and clearly distinguishes it from the application of the *Phelps* rationale. KRS 80.030 prescribes the composition of city housing authorities as consisting of "the mayor, ex officio, or his designee, and four (4) persons appointed by him with the approval of the city legislative body." [2] KRS 80.060 directs that the compensation of the members of the housing authority "shall be fixed by the legislative body of the city." KRS 80.070 allows the city legislative body to "prescribe limitations to the compensation of employees of the city authority and [it] may prescribe whether or not an employee shall devote his entire time to his duties as an employee of the authority." KRS 80.150 authorizes the use of condemnation procedures should the Authority deem it necessary in connection with the exercise of the purposes set out in KRS 80.020, directing that the "city attorney shall conduct the proceedings for the authority." Most importantly perhaps, is the fact that unlike the legislation setting out the corporate powers of the board of waterworks, we find nothing in KRS 80.050, which sets out the corporate powers of housing authorities, that could be construed as prohibiting the Authority from acting in the city's behalf. This statute stands in stark contrast to KRS 96.260 which, after vesting in the board of waterworks all authority and privileges to "exercise all the franchises, and have possession, control, and management of all the property, of the corporation of which the consolidated local government or city owns all the stock[,]" specifically limits that entity's right to make contracts and to sue and be sued by inclusion of the words "but only in the name of the corpo-

---

**2.** With the city-county merger, the number of      mayoral appointees increased to eight (8).

ration." No similar words of limitation are contained in KRS 80.050.

Furthermore, while day to day operations of the Authority are in fact delegated to an executive director appointed and answerable to the mayor, it is the mayor who dictates and approves the Authority's priorities and initiatives. The mayor, as the appointing officer, has authority under KRS 80.090 to remove any member of the housing authority for incompetence, neglect of duty or malfeasance. The extent of mayoral control over the housing authority, as well as the Authority's genesis, was long-ago noted by the Court in *City of Louisville Municipal Housing Commission v. Public Housing Administration,* 261 S.W.2d 286, 287–88 (Ky.1953):

> It is a political entity, of course; it is an incorporated body; it has some of the attributes of a state agency *although it is controlled by the Mayor of Louisville and others appointed by him.* In short, as the name signifies, it is a commission, organized under an enabling act of the General Assembly of Kentucky and operated by personnel of the City of Louisville so as to participate in the housing program of the Federal Government. [Emphasis added.]

Lastly in this regard, because Federal law prescribes in detail the rents the Authority may charge, an increase in rental income would not be available as an avenue to offset a punitive damage award. It thus becomes clear that the burden for payment of this award would be borne by the taxpayers of the Metro Government either in the form of higher taxes or reduced services, a fact deemed to be of significance in *Phelps.* Accordingly, we are convinced that the Authority sufficiently satisfies the agency criteria described in *Phelps* to bring it within the protections against punitive damage awards contained in KRS 65.2002.

Finally, in light of the fact that appellee devoted a substantial portion of his brief, as well as his argument before this Court, to the contention that the Authority waived any claim to immunity from punitive damages based upon federal instrumentality status, we deem it important to note that our decision as to the Authority's entitlement to the protections of KRS 65.2002 is dispositive and obviates any necessity of addressing the federal immunity issue.

■ The Authority also challenges as pure speculation and conjecture the testimony of a vocational and rehabilitation expert who testified as the amount of Julius's damages for loss of future wages. We find no error. The jury found that the Authority's negligence was a substantial factor in causing Julius's injuries which are indisputably permanent conditions. It is a longstanding and well-established rule in this Commonwealth that "[p]ermanent impairment of earning power is merely the test to be applied by the jury in determining the compensation to be awarded for permanent injury...." *Chesapeake & O. Ry. Co. v. Hay,* 261 Ky. 566, 88 S.W.2d 318, 320 (1935). We know of no better vehicle for assisting the jury in this regard than through the testimony of a qualified vocational and rehabilitation expert, whose credentials and methodologies went unchallenged in this case. Testimony concerning the future prospects of a child victim necessarily involves some degree of speculation, but that fact alone does not disqualify an infant plaintiff from receiving an award. In concluding that awards for permanent impairment are appropriate even in the absence of evidence that a plaintiff has ever earned money, the Court in *Spurlock v. Spurlock,* 349 S.W.2d 696, 699 (Ky.1961), adopted the following view as to the calculation of such damages:

As well said in *Sutherland on Damages,* § 1244, p. 4727:

'It seems plain that wrongful interference with any capacity or function of a human being should be compensated for, aside from any existing need for the exercise of such capacity or function.... Impaired ability to work is in itself an injury and deprivation of a substantial right of everybody, distinct from any loss of earnings it entails and the sufferer is entitled to compensation for it. It may be treated as part of the mental suffering resulting from the injury and as due to the consciousness of impaired power to care for one's self. In the nature of the case the sum which will compensate for such damage is not ascertainable by mathematical computation; it must be fixed by the jury with respect to the evidence and the probabilities, and should be sufficient to compensate therefor.'

The jury in this case had the benefit of expert testimony as to the expected future income of a person fitting Julius's vocational profile without his impairments and her calculations as to the diminution of those prospects as a result of his mental retardation and ADHD. Nothing in this testimony appears to be outside the norm for testimony of this type nor unduly inflammatory. There is present in this case sufficient evidence from which the jury could determine the amount of loss by reasonable inference from the established facts and it was within their province to assess the weight and credibility to be given that evidence. Consequently, we are convinced that the award of damages for impairment of the power to earn money is amply supported by evidence of substance.

That portion of the judgment relating to punitive damages is reversed and remanded for entry of a judgment in favor of the Metro Housing Authority. In all other respects, the judgment of the Jefferson Circuit Court is affirmed.

ALL CONCUR.