CASE 11.—TWO PROCEEDINGS BY THE CITY OF LOUIS-
VILLE AGAINST THE LOUISVILLE & NASHVILLE
R. R. CO. TO CONDEMN A RIGHT TO EXTEND
CERTAIN STREETS ACROSS THE RAILROADS
RIGH. OF WAY.—December 18.

## Louisville & Nashville R. R. Co. v. City of Louisville

Appeal from Jefferson Circuit Court; Common Pleas Branch (First Division).

EMMET FIELD, Judge.

From a decree assessing damages in each case the railroad company appeals—Reversed.

1. Eminent Domain—Right of Exercise—Cities—Streets.—Ky.
Stats. 1903, section 2831, provides that, whenever property
shall be needed for appropriate municipal purposes in cities
of the first class, the board of public works, with the consent
of the mayor if the amount be under $2,000, may order con-

demnation, and, if the amount is more, with the consent of the mayor and general council, and that proceedings shall be instituted and prosecuted in the name of the city as provided for the condemnation of property for parks. Section 2852 provides for the condemnation of land for parks on the order of the park commissioners, and prescribes the procedure, declaring that, on the return of a verdict, the court shall render judgment vesting in the park commissioners title to the property condemned, and that the judgment shall take effect on payment into court of the amount of the verdict and costs. Held that though the power of eminent domain is not inherent in municipalities, and cannot be exercised by them without statutory authority, section 2831 conferred sufficient authority on cities of the first class to condemn land for every necessary municipal purpose including streets and alleys, highways etc.

2. Same—Power of City—Streets—Right of Way Over Railroad Property.—Under Ky. Stats. 1903, section 2831, conferring on cities of the first class power to condemn land for municipal purposes, the city was authorized to condemn a street extension over a railroad's right of way, though the railroad's property was already devoted to public use, as the new use did not destroy the previous use, but both might be enjoyed together without unreasonable impairment of either.

3. Same—Condemnation for Second Public Use—Grant of Power. —Where a new public use will destroy the previous use to which the property was devoted, the power to condemn the property for such new use must be conferred in express terms and strictly followed, but general authority is sufficient where the new use will not destroy or interfere with the original use, except incidentally.

4. Same—Street Extension—Railroad Crossing.—It was no answer to a city's right to condemn a street extension over a railroad right of way that such additional use would entail more care and expense on the part of the railroad in protecting the public.

5. Same—Exercise—Delegation of Power—Reserved Power.— Where the state delegates to a public or private corporation the right to exercise the power of eminent domain, the state impliedly reserves all right of future control of the property so taken and the power to take it again and as many times as may be necessary for public use.

6. Same—Compensation—Payment.—Under Const. section 242, providing that corporations and individuals having the right of eminent domain shall make just compensation for property

taken, injured or destroyed by them which shall be paid before such taking or paid or secured before such injury or destruction, etc., a city of the first class was not authorized to extend a street across a railroad right of way until compensation had been rendered to the railroad company.

7. Same—Necessity—Public Use—Determination.—Questions of necessity and public use as applied to the right of eminent domain are distinct in the sense that the necessity is a matter to be determined by the legislative department, state, or municipal while the question of public use is for the courts.

8. Same—Opening Streets—Public Use.—While, in general, the courts will not ordinarily inquire into the question whether or not the opening of a street is for a public use, yet such question will be considered, and the right denied if it distinctly appears that the proposed street is not for the use of the public, but for the exclusive advantage of an individual.

9. Same—Street Extension—Public Use.—Where proposed street extensions over a railroad right of way were to connect the streets extended so that they might intersect other streets which would be beneficial to the public, it was no answer to the city's right to condemn a crossing for such extension that an individual would derive special benefit therefrom.

10. Same—Street Extensions—Condemnation of Crossing—Right Taken.—Where a city sought to condemn a crossing over a railroad right of way for a street extension, it was immaterial that the railroad owned the fee in the right of way; the only interest taken by the city being a right of passage.

11. Same—Street Crossing—Condemnation—Elements of Damage.—In proceedings to condemn a street crossing over a railroad right of way, the railroad company was not entitled to compensation for the construction of safety gates, for the erection of a sign board, cattle guards, and fences, for the keeping of a flagman, and for increased expense made necessary in complying with state regulations for the protection of the public at the crossing.

12. Street Crossings—Condemnation—Damages—Accidents.—A railroad company was not entitled to damages in proceedings to condemn a crossing over its right of way for increased liability to damages that it might incur on account of accidents at the crossing.

13. Crossings — Condemnation — Elements of Damage — Water Flow.—A railroad company in proceedings to condemn a street crossing over its right of way was not entitled to damages because the opening of a street might cause water in

rainy seasons to be precipitated to its damage in unusual quantities on its track and right of way, as it would not be presumed that the city would so negligently construct its streets as to throw on the tracks water which would not otherwise flow there.

14. Crossings—Condemnation—Measure of Damages.—In proceedings by a city to condemn a crossing over a railroad right of way for a street extension, the measure of the railroad company's damage was the difference in value between the exclusive and the joint use of its right of way.

15. Railroads—Crossings—Conformity of Grade.—Where a city extends a street over a railroad right of way, it is bound to conform the street to the grade of the tracks, and make its approach to the track reasonably safe for travel, or subject itself to the liability that attaches to a failure to perform such duty.

HELM & HELM, HENRY C. STONE and BENJAMIN D. WARFIELD for appellant.

A. E. RICHARDS, ELMER C. UNDERWOOD and ROWAN HARDIN for appellee.

(No briefs—Record out of office.)

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

These two cases, involving substantially the same questions of law and fact, were heard, and will be disposed of, together. In each the city of Louisville sought to condemn the land and right of way of the railroad company for the purpose of establishing two streets across the same. The action of the city was resisted upon several grounds that will be noticed in the course of the opinion.

The first objection is that the charter of the city of Louisville does not authorize, except in a general way, condemnation proceedings for the purpose of opening streets; and it is argued that, in the absence

of express authority, the city cannot invoke the power
of eminent domain for this purpose. Section 2831
of the Kentucky Statutes of 1903, being a part of the
charter of cities of the first class, reads: "Whenever
property shall be needed for appropriate municipal
purposes, either within the boundaries of the city or
the county, the board of public works may, with the
consent of the mayor, if the amount be under two
thousand dollars, order the condemnation of such
property; and if the amount be over two thousand
dollars may, with the consent of the mayor and the
general council, order the condemnation of such prop-
erty. The proceedings for the condemnation of prop-
erty for such purposes shall be instituted and prose-
cuted in the name of the city, by the city attorney, as
provided in this act for the condemnation of property
for park purposes." Section 2852, relating to the
condemnation of land for park purposes, provides
that whenever in the opinion of the board of park
commissioners property shall be needed for park pur-
poses the said board may by resolution reciting such
need order the condemnation of such property, and
the proceedings for such condemnation shall be in
the Jefferson circuit court. It sets out in detail the
manner of procedure, and provides that "upon re-
turn of the verdict of a jury the court shall enter
judgment vesting in the park commissioners of the
city the title to the property described and condemned,
the said judgment to take effect upon the payment
into court by said board of the amount of money
named in the verdict and the taxed costs of the pro-
ceedings." The statutes and methods of procedure
were approved in Board of Park Commissioners v.
Dupont, 110 Ky. 743, 62 S. W. 891, 23 Ky. Law Rep.
106, and we think they conferred upon the city in

terms as express as need be the right to condemn land for streets and highways. Although the power of eminent domain is not inherent in municipalities and may not be exercised by them without statutory authority, it is not necessary that the statute should specifically mention streets, alleys, highways, or other purposes for which the municipality may condemn property. The general power of condemnation for appropriate municipal purposes confers the authority to condemn for every necessary municipal purpose. But, if this be admitted, it is further insisted by counsel that property already dedicated to public use cannot be taken for another public use unless authority so to do is expressly conferred. So that, if this view is sound, the city could not under a general power of condemnation for municipal purposes take for a street the land or right of way of a railroad company which had theretofore been devoted to a public use and was being so used, because the charter does not, in terms, give the city the right to condemn land devoted to a public use. In support of this position, our attention is called to some Kentucky cases that we will notice. In Ruttle v. City of Covington, 10 S. W. 644, 10 Ky. Law Rep. 766, the question involved was whether or not the charter of the city of Covington or the act incorporating the Elizabethtown, Lexington & Big Sandy Railroad Company conferred the right to permit the railroad to use and occupy the streets of the city over the protest of certain persons who objected upon the ground that it would injure their property. The charter of the city provided that "the council shall also have exclusive control of the streets, sidewalks, lanes, alleys, market place, and other public grounds within the corporate limits and shall cause the same to be kept clean and

in repair,'' and that of the railroad company that ''it may construct, operate, and maintain a railway or railways from any point or points on the line of its railway to the cities of Newport, or Covington, or either of them, and from any point or points on its said line to any point or points on the line of the Kentucky Central Railroad.'' In denying the right of the council to grant the right of way, the court said: ''A municipal legislature cannot grant the right to a corporation or individual to appropriate and use the streets of a town or city for any purpose not contemplated by the Legislature when the charter was granted, and which would tend to obstruct and hinder the free use of the streets for the purpose and in the modes they are commonly understood to be dedicated for public and private use. And, as laying down railway tracks is not such an appropriation or use of streets of a town or city as they are ordinarily intended for, and as was manifestly intended by the section of the charter quoted, it seems to us no power, either express or implied, has been conferred by the city charter of Covington upon the board of councilmen to grant the right of way to the company. * * * Building and operating a railroad upon the streets of a town or city necessarily results in inconvenience and injury to those residing or having real estate adjacent to such streets, and the right of a company to thus appropriate to its use what was intended to be used by the public for different purposes, and upon the faith of which private rights and interests have been invested should never be implied, but permitted to be exercised only where there is a clearly expressed grant by the Legislature. * * * The Legislature has the undoubted power to authorize the construction and operation of a railroad through a city or town and

upon its streets when they are not wholly obstructed, even without the consent of the municipal legislature. But the authority must be conferred by express enactment, or in such language that it can be necessarily implied. * * * As the Legislature has not seen proper to give to the company in this case, in express terms, the right claimed, we are not authorized to strain the language of the statute for that purpose, when the effect would be to seriously impair the usefulness of the public streets of Covington, and do injury to the rights of individuals." To the same effect is Cornwall v. L. & N. R. Co., 87 Ky. 72, 7 S. W. 523, 9 Ky. Law Rep. 924; Commonwealth v. City of Frankfort, 92 Ky. 149, 13 Ky. Law Rep. 705, 17 S. W. 287; L. & N. R. Co. v. Whitley County Court, 95 Ky. 215, 15 Ky. Law Rep. 734, 24 S. W. 604, 44 Am. St. Rep.(220). It will be observed that neither the charter oft he city nor the act incorporating the railroad company conferred by express enactment or necessary implication the right to use the streets for railroad purposes; and for this reason the right was denied.

But here the right is conferred by necessary implication. It would be a very narrow view of the statute quoted to hold that it conferred the power to open a street to the line of the railroad, but not the authority to cross it. We think that it follows, as a necessary consequence of the powers to condemn, that this power may be exercised, not only upon private property, but upon property devoted to a public use, especially when the new use does not destroy the previous use, and when both of the uses may be enjoyed at the same time without the unreasonable impairment of either. This view is supported by the great weight of modern adjudication. Thus it is

stated in Elliott on Roads and Streets, section 219, that: "The authority to take property seized and appropriated to another public use may be implied from the language of the statute, but this can only be so where the words employed and the evident intent of the statute make it clearly the duty of the courts to give force to the implication. The intent of the Legislature to destroy the rights granted by former statutes must unequivocally appear. A grant of authority to appropriate land seized under former statutes, or previously seized for public use, cannot ordinarily be inferred from a mere general grant. The general rule is that, if the two uses are not inconsistent, both may stand together without material impairment of the first. Authority for the second use may be implied from a general grant; but, if they cannot coexist without material impairment of the first, authority to take from the second cannot be implied from a mere general grant of authority to condemn." To the same effect is Elliott on Railroads, section 1098; Lewis on Eminent Domain, section 76; Dillon on Municipal Corporations, section 588; 15 Cyc. 616; 10 Am. & Eng. Ency. of Law, 1095.

When the new public use will destroy the previous use to which the property was devoted, then the authorities before cited agree that the power must be conferred in express terms and strictly followed, and in this view we concur. But the establishment of these streets across the right of way will not destroy or interfere with, except incidentally, the use of the land for railroad purposes. Both uses may be exercised in common and without injury to the other, except in so far as the additional use may entail more care and expense in protecting the public. But this fact is not sufficient to deny the right. In all parts of the

State railroads are built across public highways and streets, and streets and highways are opened across railroads. It would be ruinous to the traffic and general welfare of the country and its people if the right to thus cross each other was denied. When the State grants to a public or private corporation the right to exercise a part of its sovereign power to take private property for a public use, it always does so with the implied understanding that future control over the property so taken is not surrendered by the State. It reserves for the public good the power to take again, and as many times as may be necessary, so much of the property as is needful for the use of the public, although this may in some cases go to the extent of destroying the first use. It is not, however, necessary in the course of this opinion to elaborate further the inquiry as to the extent of this reserved power of the State or the cases in which it may be exercised, or to point out the statutory authority necessary to confer the right to take in such a manner as will destroy the first use, or be so incompatible with its exercise as to virtually amount to its destruction, as these questions are not now before us.

In this connection, the argument is made that there is no provision authorizing the city to levy a tax to pay the property owner for the land taken or requiring that compensation must be made. The city, of course, no more than any private person or corporation, cannot take the property of a railroad or any property until just compensation has first been made. Section 42 of the Constitution declares, in part, that: "Municipal and other corporations and individuals invested with the privilege of taking private property for public use shall make just compensation for property taken, injured or destroyed by them, which com-

pensation shall be paid before such taking, or paid or
secured at the election of such corporation or indi-
vidual before such injury or destruction.'' In keep-
ing with this constitutional provision, the statutory
authority to condemn, heretofore noticed provides that
the judgment of condemnation shall take effect upon
the payment into court of the sum awarded the prop-
erty owner, including the costs of the proceedings.
It is therefore manifest from these provisions that
the property owner cannot be divested of his prop-
erty or disturbed in its possession until he has been
compensated. Without looking further into this ques-
tion, it is sufficient to say that, as the land cannot be
taken until the compensation is paid, it is for the
city to consider how the money shall be raised. The
property owner is not particularly concerned in this
feature of the proceeding, as he cannot be disturbed
in the enjoyment of his property until compensated;
but we apprehend that the argument that the city has
no means of paying the compensation is more fancied
than real.

The next contention is that the court erred in sus-
taining a demurrer to the pleading setting up that
there was no public necessity for the opening of the
streets, or, in other words, that it was attempted to
open the street for private, and not public use. It
is very generally held by the text-writers and courts
that the question of necessity and public use, both of
which enter into the subject of eminent domain, are
distinct in the sense that the necessity for the taking
is a matter to be determined by the legislative de-
partment, State, or municipal, as the case may be,
and the question whether it is taken for a public use
is for the judiciary. In other words, the prevailing
rule and the one in force in this State is that, when

the municipal authorities of a city declare in the regular way that it is necessary streets shall be opened, their action is conclusive of that question, and the courts will not, except in rare case, inquire into the necessity for opening the street or look into the motives or reasons that induced the municipal authorities to order it opened. And so, when a street or public way in a city is ordered to be opened, it will be presumed that it is to be opened for public purposes; and ordinarily the courts will not inquire into the question whether or not it is for public use. But a case might arise in which it could be made plain that the street or highway was not opened for the use of the public, but for the exclusive advantage of an individual, and was not intended to be used by the public generally, and, if this was made to appear, the courts would have the undoubted right to prevent such abuse of the exercise of the power of eminent domain, a power that finds its only support in the proposition that the property is taken for a public use. Thus it is said in Dillon on Municipal Corporations, section 600: "Of the necessity or expediency of exercising the right of eminent domain in the appropriation of private property to public uses, the opinion of the Legislature or of the corporate body or tribunal upon which it has conferred the power to determine the question is conclusive upon the courts, since such a question is essentially political in its nature and not judicial. * * * But, if the Legislature has declared the use or purpose to be a public one, its judgment will be respected by the courts, unless the use be palpably private or the necessity for the taking plainly without reasonable foundation. But, if the use be public, or if it be so doubtful that the courts cannot pronounce it not to be such as to justify

the compulsory taking of private property, the decision of the Legislature embodied in the enactment giving the power that a necessity exists to take the property is final and conclusive." To the same effect is Lewis on Eminent Domain, section 239; Smith on Municipal Ordinances, sections 702, 704; Allen v. Woods, 45 S. W. 106, 20 Ky. Law Rep. 59; Henderson v. City of Lexington, 111 S. W. 318, 33 Ky. Law Rep. 703; Chesapeake Stone Co. v. Moreland, 126 Ky. 656, 104 S. W. 762, 31 Ky. Law Rep. 1075. The answer to which a demurrer was sustained set up, in substance, that Pennsylvania avenue was being opened for the benefit of one C. N. Phillips, and that it was not necessary for the use or benefit of the public that the street be established. This avenue at the time these proceedings were instituted was opened for public use to the line of the railroad property, and it was only sought to continue the street across the railroad so that it might intersect with a street running parallel with the line of the railroad. As this avenue was an existing highway of the city of Louisville, extending from Brownsboro road to the line of the railroad, and had been opened for public use by the city, it is apparent that the extension of the street across the railroad to Frankfort avenue, another established highway of the city, was for the benefit of the public and a public use; and, although Phillips might be benefited by the extension of the street, this fact did not in any wise militate against the right of the city to open the street. The mere fact that a corporation or an individual may be deeply interested in or benefited by the taking of the property will not of itself deny to the city the right to exercise the power. It is probable that in every case where the right of eminent domain is exercised private interests

will be more or less benefited; but the existence of this fact will not be allowed to defeat the benefits that will accrue to the public. So that the court properly sustained a demurrer to the answer pleading that Phillips would derive a special benefit from the extension of the street.

It is also insisted that the court erred in instructing the jury as to the measure of compensation the railroad company was entitled to recover, and in excluding evidence offered by it upon this branch of the cases that were tried in different courts. In the Roberta Avenue Case the railroad company asked the court to instruct the jury that: "If they find for the plaintiff, the city of Louisville, then they shall find for the defendant, the Louisville & Nashville Railroad Company, the value of the land taken, and any depreciation in the value of the remainder of its right of way caused by establishing the street across it, and will further find for it such sum as will compensate it for the original cost of any structural or physical changes necessary in its property or right of way to establish a reasonably safe crossing, and such further sum as will, with interest at the rate of 6 per cent. per annum, produce an income sufficient to pay for the average yearly cost of maintaining such changes, and the average annual cost of maintaining such crossing over the defendant's right of way." In the Pennsylvania Avenue Case, the railroad company asked an instruction directing the jury to "award to the defendants as compensation for the use of its land so taken, injured, or destroyed such a sum as will fairly and reasonably represent the diminished value of the defendant's exclusive right to said track, and such further sum as you may believe from the evidence will be reasonably necessary for the defend-.

ant to expend in making necessary changes in its property and in protecting its property by crossing gates or watchmen to avoid injury to its property and the public at said place.'' Each of these instructions were refused, and the trial judges gave instructions presenting their views of the law applicable to the cases. In the Roberta Avenue Case, the jury awarded $1 as compensation, and in the Pennsylvania Avenue Case $150. In support of its theory, which was outlined in the instructions offered, as to the compensation it was entitled to receive, the company offered at each trial evidence, which was rejected, tending to show the value of its land where the street crossed its right of way, the diminution in the value of the right of way for railroad purposes caused by the establishment of the street, the cost of raising the tracks to conform to a grade deemed by the company necessary for safe travel, and of constructing and maintaining the crossing and flagmen or gates thereat, and the expense of such necessary structural or physical changes as might be necessary to protect the company's interest and make the crossing reasonably safe. The company's contention is that the proper measure of damage it was entitled to was compensation for the property taken, injured, or destroyed, including the value of the depreciation in the value of its right of way, the cost of any structural or physical changes necessary in its property to establish a reasonably safe crossing, and the expense of maintaining and protecting the same. On the other hand, the city's contention is that although the railroad company was entitled to damages for any diminution in the value of its exclusive right to use its tracks, it was not entitled to any compensation for the land occupied by the street, or for erecting and maintaining

gates or watch towers, or providing a flagman, or for the increased danger of accident, or for constructing or maintaining a suitable crossing, or the expense of structural or physical changes made necessary by the crossing. That a railroad company, whether it be the owner of the fee as in these cases or merely of the right of way, is entitled to just compensation for the establishment of a highway or street over its line or right of way, cannot be denied. The constitutional provision that "property shall not be taken without just compensation" applies to the property of railroads as well as to property of individuals. The only question is: What is the measure of compensation to which a railroad company is entitled when it is proposed to open a street or highway across it. Upon this subject we have been furnished with an array of authorities in support of the respective contentions of the parties that illustrate the various and contradictory views of courts of last resort upon the question of what compensation a railroad company is entitled to in cases of this character. The leading case in support of the position of the city is Chicago, Burlington & Quincy Railroad Company v. Chicago, 166 U. S. 226, 17 Sup. Ct. 581, 41 L. Ed. 979, in which the city opened a street across the land and right of way of the railroad company. The Supreme Court held that the expense of erecting safety gates for the protection of the crossing, constructing, and maintaining the crossing, or the damage that might be incurred by accident or additional expense in operating the trains, were not proper elements of damage, saying that the whole compensation to which the railroad company was entitled was "the difference between the value of the right to the exclusive use of the land in question for the purposes for which it was being used, and

for which it was always likely to be used, and that value after the city had acquired the privilege of participating in such use by the opening of a street across it, leaving the railroad track untouched." And this measure of compensation has been adopted by several states. The leading case sustaining the contention of the railroad company is Old Colony & Fall River R. Co. v. Plymouth, 14 Gray (Mass.) 155, where it was held that the measure of damage to which a railroad company was entitled when crossed by a highway was the expense of erecting and maintaining signs required by law at crossings, for making and maintaining cattle guards at the crossing, if necessary, and for the expense of flooring the crossing and keeping the planks in repair, and such other expenses as necessarily result from the establishment of the highway. And this case has been followed by many courts of last resort.

As the question is a new one in this State, we feel at liberty to lay down such a rule as will in our judgment award to the company just compensation; and, in doing so, do not feel disposed to follow the authorities cited by counsel for the railroad company, although many of them are from courts of the highest standing and their opinions entitled to weighty consideration. In arriving at what is just compensation to a railroad company, it is appropriate to consider briefly the rights and duties of railroad companies to the public. The charter of the appellant company conferred upon it the power of eminent domain, giving it the right to acquire by purchase or condemnation land needed for its use in the service of the public. Having conferred upon it this power and the privileges incident thereto, the State in the interests of the public reserved the right to make such reasonable regula-

tions concerning it as the public good might require. And in imposing these regulations the State is not limited to those put in operation before the establishment of the railroad, but may exact such others as from time to time seem necessary and useful for the protection of life and property. Public streets and highways are as essential for the convenience and benefit of the public as are railroads. It is indispensable that they should be established across railroads; and, when so opened, the State in the exercise of its police power may demand from the company that these highways and street crossings shall be so constructed, maintained, and protected as not to unnecessarily endanger the lives of persons rightfully using them. To this end, railroad companies are required by statute to erect at some crossings safety gates, at others to keep flagmen, at others to erect sign boards, cattle guards and fences, and yet at others to give reasonable warning of the approach of trains by sounding the whistle and ringing the bell; and have always been required to maintain crossings in suitable repair for public travel. It is generally considered that these duties which are exacted in the exercise of the police power a railroad company is not entitled to compensation for performing. They are imposed as a duty deemed essential for the protection of travelers upon other highways that have been set apart for public use, and exacted as a part of the consideration required for the right to exercise the power of eminent domain and the other franchises and privileges enjoyed. Upon this ground is put the well-established doctrine that railroad companies can not recover damages arising from the cost or expense of doing or maintaining those things that the State may compel them to do. Chicago R. Co. v. Chicago, 166

U. S. 226, 17 Sup. Ct. 581, 41 L. Ed. 979; State v. District Court of Hennepin County, 42 Minn. 247, 44 N. W. 7, 7 L. R. A. 121; Chicago, M. & St. P. Ry. Co. v. City of Milwaukee, 97 Wis. 418, 72 N. W. 1118; Chicago & N. W. Ry. Co. v. Chicago, 140 Ill. 309, 29 N. E. 1109; Morris Railroad Co. v. City of Orange, 43 Atl. (N. J.) 730; Portland R. Co. v. Deering, 78 Me. 61, 2 Atl. 670, 57 Am. Rep. 784. So that it may safely be said, both upon principle and authority, that the appellant railroad company was not entitled to compensation for the expense it might necessarily incur in constructing, maintaining, or protecting these streets across its right of way. Nor was it entitled to compensation for the increased liability to damages that it might be required to pay on account of accidents at these crossings. This element is entirely too conjectural and speculative to be considered. Accidents and resulting litigation or damages may or may not occur. But in no view of the case that we can conceive of should this feature be allowed to enter into a case upon the issue of compensation.

The company also attempted to show that the opening of these streets would cause water in rainy seasons to be precipitated to its damage in unusual quantities upon its tracks and right of way. If the city so negligently constructs its streets as to put upon the right of way and tracks water that would not otherwise have gone there, or if in opening the streets the topography of the ground is so changed as to cause water, that except for this change would flow elsewhere, to flow upon the right of way in unusual and damaging quantities, the company may have an action for damages against the city, but we think this question was entirely foreign to the issue involved in the

condemnation proceedings, and no evidence upon this point was competent.

The argument is also made that the company was entitled to compensation for the value of the land in which it owned the fee that was taken by the street and the depreciation in the value of the remainder of its right of way caused by the establishment of the street. The fallacy of this argument consists in the assumption that its land was taken by the street. The city did not offer or desire to take any land, but only the right to use it jointly with the company. As well said in the supreme court case, supra: "The land as such was not taken, the railroad company was not prevented from using it, and its use for all the purposes for which it was held by the railroad company was interfered with only so far as its exclusive enjoyment for purposes of railroad tracks was diminished in value by subjecting the land within the crossing to public use as a street. * * * As the right to open a street across the railroad tracks was all that the city sought to obtain by the proceeding for condemnation, it was not bound to obtain and pay for the fee in the land over which the street was opened." The fact that the company owned not merely a right of way but the fee does not affect the question. The land, however acquired, was secured for railroad purposes. No other use was contemplated, and it is entirely safe to say that it will never be put to any other use. So that nothing was in fact taken or sought to be taken except the right to joint use of so much of the right of way as the streets will occupy. All that the company will be deprived of by the streets is the exclusive use of its right of way at these places and the difference in value between the exclusive and the joint use is the full measure of its just compensation.

In respect to the argument that it will be necessary to make structural or physical alterations in its tracks by lowering or raising them to conform to the grade of the streets, to the end that the crossings may be reasonably safe for public travel, and that compensation should be allowed for this, our answer is that the city must conform its streets to the grade of the tracks, and itself make the streets as they approach the track reasonably safe for travel or subject itself to the liability that attaches to a failure to perform a duty like this.

The only instruction that should be given is one saying to the jury that they must find for the railroad company in such a sum as will amount to the difference between the value to the railroad company of the right to the exclusive use of the land occupied by the street for the purposes for which it was being used and the value after the city acquires the privilege of participating in such use by the opening of the street across it, and the evidence should be confined to this point. Although in some respects more favorable to the railroad company than it had the right to ask, the correct measure of damages was not submitted in either case, and the judgment in each case is reversed, with directions to order a new trial consistent with this opinion.