**GOD'S CENTER FOUNDATION, INC., Appellant,**

v.

**LEXINGTON FAYETTE URBAN COUNTY GOVERNMENT, Appellee.**

**No. 2001–CA–000982–MR.**

Court of Appeals of Kentucky.

Nov. 8, 2002.

Rehearing Denied Jan. 16, 2003.

Discretionary Review Denied by Supreme Court Feb. 11, 2004.

Gayle E. Slaughter, Lexington, KY, for appellant.

Theresa L. Holmes, Rochelle E. Boland, Lexington, KY, for appellee.

Before DYCHE, HUDDLESTON and JOHNSON, Judges.

### OPINION

JOHNSON, Judge.

God's Center Foundation, Inc., has appealed from the findings of fact, conclusions of law, and order entered by the Fayette Circuit Court on April 13, 2001, which held that the Lexington–Fayette Urban County Government (LFUCG) properly exercised its power of eminent domain in seeking condemnation of the Lyric Theatre property for a valid public purpose. Having concluded that the factual findings made by the circuit court in support of its rulings were supported by substantial evidence and that the circuit court did not err in its legal conclusions that the LFUCG did not act arbitrarily or in excess of its authority in seeking condemnation of the Lyric Theatre, we affirm.

This case has a long, combative history centering on the preservation and operation of the Lyric Theatre located on East Third Street in Lexington, Kentucky. The Lyric Theatre opened in 1948 and served as the primary entertainment venue for African–Americans in the city with performances by major black artists and movies at a time of segregation in other theaters. As a result, the Lyric Theatre developed significant cultural importance and became a symbol of pride to the African–American community in the city. As its business declined, the Lyric Theatre closed in 1963 and fell into serious disrepair until it was acquired in 1984 by Larry Huffman. Huffman serves as the Chairman of the Board of God's Center, and he deeded the property to God's Center. God's Center is a non-profit, religious-based organization, which is self-described as an "educational foundation dedicated to restoring ethical values and moral education among the populace." God's Center made some repairs to the building, and it hoped to conduct educational and cultural instruction, but it has not reopened the facility to the public.

Due to the historic importance of the Lyric Theatre, in the mid to late 1990's, the LFUCG developed a plan to preserve the building and to restore it for use as an African–American cultural center in conjunction with an overall redevelopment plan for the downtown area. In January 1997 the LFUCG entered into a Memorandum of Understanding (MOU) with the Commonwealth of Kentucky to settle a lawsuit in which the LFUCG agreed to invest approximately $930,000.00 in an African–American cultural project centered on the Lyric Theatre including any necessary renovation of the building.[1] The MOU obligated the LFUCG to "use its best efforts to obtain all necessary titles or rights of entry for the construction of this project including taking any necessary eminent domain actions, within a reasonable time from the execution of the Memorandum of Understanding."

Shortly thereafter, the LFUCG entered into negotiations with God's Center for purchase of the Lyric Theatre. The

---

**1.** The MOU also involved the funding and development of several other art and cultural projects including the Civic Center Expansion, Embry/Lowenthall Theatre, State Theatre Renovation, the History Museum, the U.K. Basketball Museum, and the Lexington Children's Theatre. The lawsuit involved a breach of contract by the LFUCG for failure to build a single large art and cultural center on the Ben Snyder block for which the city had received state funds.

LFUCG offered to purchase the property for $59,000.00 based on the higher of two appraisal reports it had obtained.[2] God's Center proposed a cooperative arrangement whereby it would retain ownership and primary control and operation of the building with the LFUCG providing input on possible events and some resources for renovation. LFUCG would receive an easement in the building.

Unable to reach an agreement with God's Center and following a vote by the LFUCG Council authorizing legal action, the LFUCG filed a petition on April 30, 1997, pursuant to the Eminent Domain Act[3] and KRS Chapter 67A, to condemn the Lyric Theatre and surrounding property located on East Third Street in Lexington. The petition alleged that the property was "necessary for an African–American cultural project as agreed in a Memorandum of Understanding between the Commonwealth of Kentucky and the Lexington–Fayette Urban County Government ...." On May 1, 1997, an order was entered appointing three commissioners, who assessed the property with a fair market value of $113,400.00. In opposing the condemnation, God's Center alleged that the LFUCG had acted in bad faith during negotiations; the LFUCG had instituted the proceedings to fraudulently and illegally deprive God's Center of its private property rights and to assist political allies; and the LFUCG had acted arbitrarily and in excess of its lawful authority. God's Center asserted that a taking by eminent domain was neither necessary nor for a public need.

On October 22, 1997, the LFUCG filed a motion for an interlocutory summary judgment pursuant to KRS 416.610(4). On November 6, 1997, God's Center filed a response in which it alleged that the condemnation was not necessary and in bad faith because it was part of a self-enrichment scheme to legitimize payment of monies to political allies of the LFUCG. God's Center stated that the LFUCG had discriminated against it; and the LFUCG did not need a fee title interest in the property for the public purpose that the LFUCG had asserted as justification for the condemnation. God's Center claimed that there were numerous disputed genuine issues as to material facts which precluded summary judgment. On December 6, 1997, the circuit court entered an order and opinion granting the LFUCG's motion for summary judgment. Subsequently, on February 26, 1998, the circuit court entered an interlocutory order and judgment of condemnation pursuant to KRS 416.610(4), which was appealed by God's Center.

On July 23, 1999, this Court rendered an Opinion reversing the trial court's interlocutory judgment and remanding the case for a trial on the issue of the LFUCG's right to condemn the disputed property.[4] After reviewing the law governing eminent domain and summary judgment, this Court held that God's Center was entitled to an evidentiary hearing on its factual allegations challenging the legality of the LFUCG's actions. Following this Court's Opinion, the parties conducted further discovery and God's Center filed a motion for leave to file a counterclaim and a third-

---

2. The LFUCG had received appraisals of $54,000.00 and $59,000.00 from two private appraisers using different valuation methodologies.

3. Kentucky Revised Statutes (KRS) 416.540 *et seq.*

4. *God's Center Foundation, Inc. v. Lexington–Fayette Urban County Government,* 1998 CA–000701–MR (unpublished opinion).

party complaint based on the federal Racketeer Influenced and Corrupt Organizations Act (RICO).[5] The LFUCG opposed the motion by arguing that it was untimely and that it alleged no new facts. The circuit court denied the motion in part because it would have introduced additional defendants not otherwise involved in the eminent domain action which was the primary focus of the litigation.[6]

The circuit court conducted a bench trial on March 5, 6, and 7, 2001, with 14 witnesses testifying for God's Center and six witnesses for the LFUCG. When God's Center attempted to introduce several letters discussing settlement of the lawsuit, the trial court granted the LFUCG's motion to exclude evidence of negotiations between the parties that occurred after the condemnation action was filed. Following the trial, the circuit court on April 13, 2001, entered its findings of fact, conclusions of law, and order granting the LFUCG's petition to acquire the Lyric Theatre property through eminent domain. The trial court ruled that the LFUCG did not act arbitrarily or abuse its discretion in seeking a fee simple title through condemnation of the property. The judgment reserved the issue of the appropriate fair market value to be paid God's Center for title to the property, but it was made final for the purpose of appeal.[7] This appeal followed.

▮▮▮ It is undisputed that the LFUCG has the authority to condemn property through the sovereign power of eminent domain of the Commonwealth [8] subject to the constitutional restriction that the taking be for "public use" and the condemnee receive "just compensation." [9] The taking of private property for a non-public use may also offend due process and the prohibition on the arbitrary exercise of power in Section 2 of the Kentucky Constitution.[10] Generally, the condemning body has broad discretion in exercising its eminent domain authority including the amount of land to be taken.[11] A determination by the condemnor that the taking is a necessity is ordinarily conclusive,[12] but the courts will review the condemning body's exercise of

---

**5.** 18 U.S.C. § 1961 *et seq.* God's Center alleged a conspiracy between members of the LFUCG and several individuals to take its property and to convert it to the personal use of these individuals.

**6.** God's Center has not appealed this issue, so we will not address it in this Opinion.

**7.** Kentucky Rules of Civil Procedure (CR) 54.02; KRS 416.610.

**8.** *See, e.g., Boom v. Patterson,* 98 U.S. 403, 25 L.Ed. 206 (1878)(the right of eminent domain is an attribute of sovereignty and is not dependent on authority conferred by the Constitution); *United States v. 170.88 Acres of Land,* 106 F.Supp. 623 (E.D.Ky.1952); *Decker v. City of Somerset,* Ky.App., 838 S.W.2d 417, 423 (1992)(Legislature has delegated to cities same power to condemn as that of the state); and KRS 82.082.

**9.** *See* Ky. Const. §§ 13, 242; The Eminent Domain Act, KRS 416.540–680; *V.T.C. Lines, Inc. v. City of Harlan,* Ky., 313 S.W.2d 573 (1957); and *Barker v. Lannert,* 310 Ky. 843, 222 S.W.2d 659, 663 (1949).

**10.** *See City of Owensboro v. McCormick,* Ky., 581 S.W.2d 3, 5–6 (1979); *Sturgill v. Commonwealth, Department of Highways,* Ky., 384 S.W.2d 89, 90 (1964); and *Prestonia Area Neighborhood Association v. Abramson,* Ky., 797 S.W.2d 708 (1990).

**11.** *See Commonwealth, Department of Highways v. Vandertoll,* Ky., 388 S.W.2d 358, 360 (1964); *Commonwealth, Department of Highways v. Burchett,* Ky., 367 S.W.2d 262, 264 (1963); *McGee v. City of Williamstown,* Ky., 308 S.W.2d 795, 797 (1957); and *Davidson v. Commonwealth ex rel. State Highway Commission,* 249 Ky. 568, 61 S.W.2d 34, 37 (1933).

**12.** *See Idol v. Knuckles,* Ky., 383 S.W.2d 910, 911 (1964); and *Spahn v. Stewart,* 268 Ky. 97, 103 S.W.2d 651 (1937).

discretion for arbitrariness or action in excess of its authority.[13] The condemnor's decision on the amount of land to be condemned will be disturbed only if it is unreasonable in relation to the public interest or welfare involved and the condemnor may consider the future, as well as the present, needs for the taking.[14] Kentucky courts have also imposed a duty on the condemnor to negotiate in good faith the acquisition of the property prior to seeking condemnation.[15] In *City of Bowling Green v. Cooksey*,[16] the Court stated: "Under KRS 416.550, the condemnor cannot acquire the property in fee simple if it can obtain access or use of the property through other privileges or easements."[17] The party challenging the condemnation, however, bears the burden of establishing the lack of necessity or public use and abuse of discretion.[18]

Since this case was tried before the circuit court without a jury, we review the trial court's factual findings under a clearly erroneous standard and the legal issues *de novo*.[19] Factual findings are not clearly erroneous if they are supported by substantial evidence.[20] "Substantial evidence has been conclusively defined by Kentucky courts as that which, when taken alone or in light of all the evidence, has sufficient probative value to induce conviction in the mind of a reasonable person."[21] It is within the province of the trial court as the fact-finder to determine the credibility of the witnesses and the weight given to the evidence.[22] Although the factors of necessity and public use associated with condemnation are ultimately legal issues, resolution of those issues encompasses factual matters subject to deferential review on appeal.

God's Center challenges several factual findings and legal conclusions of the trial court concerning the LFUCG's decision to obtain a fee simple title interest in the Lyric Theatre through its power of eminent domain. It criticizes the trial court's evaluation of and the weight given various portions of the evidence. As an initial matter, we note the evidence unambiguously reveals and there is little disagreement that the Lyric Theatre has historical and cultural significance to the African–American community of the city. It is the

---

**13.** See *Proffitt v. Louisville & Jefferson County Metropolitan Sewer District*, Ky., 850 S.W.2d 852, 854 (1993); and *Vandertoll, supra* at 360.

**14.** See *McGee, supra* at 796–97; and *Pike Co. Board of Education v. Ford*, Ky., 279 S.W.2d 245 (1955).

**15.** See *Eaton Asphalt Paving Co. v. CSX Transportation, Inc.*, Ky.App., 8 S.W.3d 878, 883 (1999)(quoting *Usher & Gardner, Inc. v. Mayfield Independent Board of Education*, Ky., 461 S.W.2d 560 (1970)). *See also Coke v. Commonwealth, Department of Finance*, Ky., 502 S.W.2d 57 (1973).

**16.** Ky.App., 858 S.W.2d 190 (1992).

**17.** *Id.* at 192.

**18.** See, e.g., *Embry v. City of Caneyville*, Ky., 397 S.W.2d 141, 143 (1965); *McGee, supra* at 797; and *Decker, supra* at 422.

**19.** See *Carroll v. Meredith*, Ky.App., 59 S.W.3d 484, 489 (2001); *Commonwealth, Transportation Cabinet, Dept. of Highways v. Taub*, Ky., 766 S.W.2d 49 (1988); and CR 52.01.

**20.** *Id.*

**21.** *Bowling v. Natural Resources & Environmental Protection Cabinet*, Ky.App., 891 S.W.2d 406, 409 (1994)(citing *Kentucky State Racing Commission v. Fuller*, Ky., 481 S.W.2d 298, 308 (1972); and *Blankenship v. Lloyd Blankenship Coal Co., Inc.*, Ky., 463 S.W.2d 62 (1970)).

**22.** See *Uninsured Employers' Fund v. Garland*, Ky., 805 S.W.2d 116, 118 (1991); and *Cole v. Gilvin*, Ky.App., 59 S.W.3d 468, 473 (2001).

only remaining structure in the area formerly centered along Deweese Street that represented the major economic and cultural center for African–Americans between 1900 and 1970. Clearly, the LFUCG's represented purpose for the condemnation in order to preserve the Lyric Theatre structure and to utilize it for African–American cultural projects is a valid "public use" that would benefit both the public at large and the African–American community in particular.[23]

Despite the recognized public significance of preserving the Lyric Theatre, God's Center questions the sincerity of the LFUCG's stated purpose and it asserts that LFUCG's predominant intent was to benefit a small group of individuals. God's Center alleges "the motives and the reasons for Appellee (LFUCG) taking the subject property was, in fact, not for a public purpose, but was a mere scheme to turn the property over to [Robert] Jefferson, [George] Brown, [Julian] Jackson, and others who had a vested personal interest in acquiring the property for their exclusive use and control." This allegation concerns the role of the Lyric Heritage Foundation (Lyric Foundation) and the Second District Retirees. The Second District Retirees was a group of retired persons formed to discuss and to act upon issues affecting the African–American community. The Lyric Heritage Foundation was created in the early 1990's in order to promote the preservation of the cultural heritage of the City of Lexington with its primary objective being restoration of the Lyric Theatre. The Lyric Foundation

presented its concerns to officials in the LFUCG and cooperated in the selection and retaining of the architectural firm of Brazley & Brazley by the LFUCG, which produced a feasibility study in 1993 for the renovation of the Lyric Theatre. At some point, the Second District Retirees joined with the Lyric Foundation in promoting restoration of the Lyric Theatre. Robert Jefferson was the LFUCG Council representative for the Second District and George Brown was the representative for the First District, where the Lyric Theatre was located. Both men were also members of the Lyric Foundation/Second District Retirees, and they were active in seeking the LFUCG's involvement in preserving the Lyric Theatre.

God's Center attempted to show that the LFUCG intended to benefit these private groups through two letters between the LFUCG Mayor Pam Miller and Brown/Jefferson/or Jackson, and one letter from the latter to the other members of the Lyric Foundation.[24] In a June 1997 letter, Brown/Jefferson thanked Mayor Miller for attending a May meeting with the Lyric Foundation and stated, "The Lyric Foundation would coordinate the restoration of the Lyric Theatre." In a July 1997 letter, Mayor Miller wrote to Brown/Jefferson/Jackson stating, "We are delighted to have you hosting the workshop and being the focal point for community input on the Lyric restoration." In an April 1997 letter to the Second District Retirees, Jefferson/Jackson stated that the Mayor had indicated that "our group was

**23.** *Cf. Coke, supra* (purchase and maintenance of Mary Todd Lincoln Home as part of state park was valid public use and proper subject for condemnation); and *Decker, supra* at 421 (condemnation of property for conference and exhibit center with auditorium, theater, and office complex was valid public use by "creating or increasing the public recreational, cultural and related business facilities of a community").

**24.** *See, e.g., Prestonia Area Neighborhood Association, supra* at 711 ("Kentucky law does not permit the taking of private property for the purpose of transfer to another private enterprise").

the primary entity regarding the Lyric." God's Center maintains that these letters and the political connections of the individuals involved show an intent by the LFUCG to allow the Lyric Foundation to control use of the Lyric Theatre.

■ The trial court rejected God's Center's argument that the LFUCG's true intent was for a private, rather than public, purpose or use. The trial court found that God's Center had failed to produce any evidence beyond speculation that the LFUCG intended to involve the Lyric Foundation/Second District Retirees in any improper manner in the operation or management of a restored Lyric Theatre. The trial court also found that God's Center failed to produce any evidence that the LFUCG had any intent to convey ownership of the Lyric Theatre to any private entity.

The evidence at trial indicated that the Lyric Foundation/Second District Retirees actively pursued the involvement of the LFUCG and sought to provide input into the restoration of and use of the Lyric Theatre as a cultural center. Robert Jefferson testified that the members of the Lyric Foundation questioned God's Center's financial ability to conduct such a project given its failure to restore the building since purchasing it in 1984. We cannot say that the trial court's finding which constituted a rejection of the evidence presented by God's Center on this issue was clearly erroneous. Every witness questioned on this issue stated the LFUCG never offered to allow the Lyric Foundation to control either the restoration or the subsequent use of the building.

Jefferson and Jackson testified that the group was concerned with restoration of the original facade and lobby of the theater building and had no real interest in controlling its future use. The LFUCG sought input from the entire community by holding several open community meetings in addition to the meetings with the Lyric Foundation. In the April 1997 letter from Jefferson to the Second District Retirees, he stated, "The Mayor attended our last meeting and confirmed that our group was the primary entity regarding the Lyric.... Unfortunately, the Mayor now considers the project to be a community wide project, and has discussed the formation of a commission, in lieu of our group, to determine the future of the Lyric." [25] The conduct of the LFUCG with respect to the role of the Lyric Foundation was not improper. The trial court's factual findings on this issue were clearly supported by substantial evidence, and God's Center has failed to show that the LFUCG's primary purpose in seeking condemnation of the Lyric Theatre was not for a public use.

God's Center's primary complaint concerns the necessity for the LFUCG to acquire a fee simple title ownership in the Lyric Theatre. It asserts that the LFUCG's stated public purpose of historic preservation and use of the building as a cultural center could be accomplished without title ownership, such as through the granting of a historic easement and God's Center's willingness to allow other groups to use the building. God's Center maintains the LFUCG's action is unreasonable and excessively expensive citing *Chesa-*

---

**25.** Pursuant to the LFUCG Council's resolution authorizing condemnation, Bob Ramsey, Director of the Division of Parks and Recreation, along with an 11 member committee, prepared a proposal in August 2000 to identify the best use of the Lyric Theatre. It suggested a multipurpose renovation with a theater, museum, meeting room, workshop areas, exhibition hall, and vendor space. It also recommended that the LFUCG be responsible for managing and maintaining the building under the auspices of the Division of Parks and Recreation and/or Department of Social Services.

*peake & O.R. Co. v. Greenup County,*[26] and *Davidson, supra.*

■ We conclude that the trial court did not err in holding that the LFUCG's taking of a fee simple interest was necessary to accomplish the public use. The evidence indicated that the LFUCG intended to expend approximately $1 million to $1.8 million to renovate the property. The LFUCG proposed establishing an auditorium/theater area, a museum/art exhibit area, meeting hall/educational area, and vendor gift shop area.[27] The LFUCG estimated the total annual personnel and overhead costs in managing the facility at approximately $221,500.00. The trial court's determination that the LFUCG's desire to acquire title ownership in the property was not unreasonable given the substantial funds to be expended on the project was supported by the evidence and correct as a matter of law. In addition, while God's Center expressed some flexibility in allowing other groups to utilize the building, it admitted that its primary mission is the promotion of Judeo–Christian values. As the owner of the building, God's Center's proposal would allow it to retain the ultimate authority to control the type of groups and the nature of the programs using the building. While the goals and function of God's Center may be laudable, it is not unreasonable for the LFUCG to seek the ability to control the Lyric Theatre for a more diverse, broad-based public use free from potential repeated conflicts that could arise from the need to gain God's Center's approval.

God's Center's reliance on *Chesapeake* and *Davidson* is misplaced. In *Chesapeake,* the Court indicated that the judicia-

ry may look at the motives and reasons for the condemnation in reviewing the condemning body's determination of necessity. In *Davidson,* the Court stated that "necessity" with respect to eminent domain means "a reasonable necessity, such as would combine the greatest benefit to the public with the least inconvenience and expense to the condemning party and property owners consistent with such benefit . . . ."[28] Nevertheless, both cases reiterate the established principle that judicial review of necessity is extremely limited and the condemnor's determination of necessity will be respected unless the use is "palpably private" or "plainly without reasonable foundation."[29] In the case before us, the trial court's determination that the taking was necessary for a valid public purpose was supported by the evidence and correct as a matter of law.

God's Center also challenges the trial court's factual finding that the LFUCG engaged in good faith negotiations prior to filing the eminent domain petition. A few months prior to filing the condemnation action, Mayor Miller met with representatives of God's Center about possibly purchasing the theatre property. At the meeting, God's Center's representatives expressed strong opposition to selling the property to the LFUCG; but they expressed a willingness to discuss other options for the property such as an easement to the LFUCG for the facade and a leasehold agreement. Based on God's Center's position, the LFUCG obtained two independent appraisals that estimated the property had a fair market of $50,000.00 and $59,000.00, respectively. On March 5, 1997, the LFUCG sent a letter and copies of the two appraisals to God's Center of-

---

**26.** 175 F.2d 169 (6th Cir.1949).

**27.** *See supra* note 25.

**28.** *Davidson, supra* at 36.

**29.** *Chesapeake, supra* at 174 (quoting *Louisville & N.R. Co. v. City of Louisville,* 131 Ky. 108, 118–19, 114 S.W. 743, 747 (1908)).

fering to purchase the property for the higher appraisal of $59,000.00. On March 25, 1997, God's Center sent a letter to the LFUCG rejecting the offer to purchase the property "for any amount of money." It offered to discuss granting the LFUCG an easement in the facade and stated "the city needs to understand that the bottom line is that we are not interested in selling or leasing this property to the city." Following receipt of this letter, the LFUCG filed the condemnation petition on April 30, 1997.

God's Center contends that the LFUCG acted in bad faith in negotiating control over the Lyric Theatre by failing to conduct discussions based on less than fee simple ownership by the LFUCG. This contention actually implicates two separate issues: the actual negotiation process and the necessity for a fee simple ownership interest. The good faith negotiation requirement concerns the negotiation process, rather than the condemnor's evaluation of the type of legal interest necessary to carry out its public purpose. The necessity requirement concerns the right of the condemnor to exercise its authority as an initial matter.[30]

In *Coke, supra,* the Court held that the condemnor is not required to haggle in order to satisfy its obligation to negotiate in good faith the purchase of property:

> The judge found that there was an offer which the landowners rejected. The evidence showed that efforts to buy the property were made over a substantial period of time, that the state made a legitimate offer, and the landowners flatly rejected it. The evidence further

showed that the landowners had stated on several occasions that they would sell the house alone but would never sell the lot on which the house stood. The trial judge found that the owners had "indicated that the property was not for sale in fee." It is our opinion that there was a good faith effort "to agree with the owner . . . on a price," which is what the statute, KRS 56.463(5), requires.[31]

In the case *sub judice,* God's Center's representatives expressed an unwillingness to sell the Lyric Theatre property to the LFUCG in a meeting between the parties. The LFUCG then offered to purchase the property at the higher amount of two independent appraisals. God's Center rejected the offer and stated it would not consider sale of the property "for any amount." The LFUCG provided God's Center an adequate opportunity to discuss the sale of the property and to negotiate the proper amount of compensation. God's Center's position clearly suggested that further negotiations would be unproductive. Further, the LFUCG's refusal to accept a lesser legal interest in the property did not constitute bad faith. There is no evidence that the LFUCG actually believed that anything less than fee simple title was necessary to carry out its public purpose. Thus, the trial court's factual finding that the LFUCG engaged in good faith negotiations prior to filing the condemnation action was supported by substantial evidence and was not clearly erroneous.

God's Center also asserts the trial court erred by granting the LFUCG's motion to exclude evidence concerning settlement

---

**30.** *See, e.g., City of Bowling Green, supra.*

**31.** 502 S.W.2d at 59. *See also Usher & Gardner, Inc., supra* at 562–63 (indicating that a simple take-it-or-leave-it offer of a manifestly inadequate amount "could evidence bad faith

negotiations"); and *Eaton Asphalt Paving Co., supra* (stating condemnor was not required to accept condemnee's position on its interests with respect to compensation to satisfy its obligation to negotiate in good faith).

negotiations between the parties that occurred after the eminent domain petition was filed. In response to the trial court's ruling, the parties prepared a set of stipulations consisting of the evidence that would have been offered including three letters dated September–November 1997. In the negotiations, God's Center presented various proposals for a set number of days for exclusive use of the building by the LFUCG, God's Center, the "faith community," and the "general community." God's Center also offered to grant the LFUCG a historic preservation easement, sharing of maintenance costs, expenditure of $930,000.00 by the LFUCG as set out in the MOU, and $500,000.00 in funds to be provided by God's Center. The parties also discussed a possible transfer of other government-owned realty in exchange for the Lyric Theatre property. The proposal was abandoned when the building on the other property was demolished. While the LFUCG consistently told God's Center that it needed a fee simple interest in order to serve the public purpose for the property, it encouraged God's Center to participate in determining the future use of the building.

Traditionally, evidence of compromise and settlement negotiations was not admissible based on a desire to encourage settlement of disputes.[32] This approach has been held to apply to condemnation actions.[33] Under KRE [34] 408, evidence of the parties' offering or accepting a valuable consideration in an attempt to compromise or settle a disputed claim or evidence of conduct or statements made in compromise negotiations is not admissible to prove liability for or invalidity of the claim. This rule further provides, however, that it does not require exclusion when the evidence is offered for another purpose. This rule is based in part on the general principle excluding irrelevant evidence.[35] Review of the trial court's decision on whether to exclude evidence based on relevancy is subject to the abuse of discretion standard.[36]

■ God's Center argued before the trial court that it was offering the evidence on the post-filing settlement negotiations as proof on the issue of whether the LFUCG had negotiated in good faith. First, we question the relevancy of this evidence because the case law and KRS 416.550 appear to impose a duty of good faith negotiations *prior to seeking condemnation* by the filing of an eminent domain petition. God's Center has presented no case law supporting its position and admitting such evidence could have a significant detrimental affect on the settlement of condemnation lawsuits.

Nevertheless, even assuming this evidence should have been admitted, God's Center has not shown that it was prejudiced. Errors in the exclusion of evidence are not grounds for disturbing a judgment unless they affect the substantial rights of the parties.[37] While the evidence of the post-filing negotiations provided some additional detailed information on God's Center's proposals for use of the property, it did not differ significantly from testimony

---

**32.** *See, e.g., Wolf Creek Collieries Co. v. Davis,* Ky., 441 S.W.2d 401 (1969); and Lawson, *The Kentucky Evidence Law Handbook* § 2.50 (3rd ed., 1993).

**33.** *See Commonwealth, Department of Highways v. Smith,* Ky., 358 S.W.2d 487 (1962).

**34.** Kentucky Rules of Evidence.

**35.** *See Green River Electric Corp. v. Nantz,* Ky.App., 894 S.W.2d 643 (1995).

**36.** *Id.; Love v. Commonwealth,* Ky., 55 S.W.3d 816, 822 (2001); *Partin v. Commonwealth,* Ky., 918 S.W.2d 219, 222 (1996).

**37.** CR 61.01; KRE 103(a).

by God's Center's witnesses on its pre-filing negotiations. Consequently, it was substantially cumulative of other evidence. God's Center was allowed to offer testimony on its proposed alternatives to condemnation and the LFUCG's insistence on a fee simple title, and the additional evidence would not have resulted in a different outcome. Thus, any error in excluding the post-filing negotiation evidence was harmless.

 Finally, God's Center argues that it was treated disparately from other "litigants under similar facts and law"; and the LFUCG's action violated its various constitutional rights under the First, Fifth, Ninth and Fourteenth Amendments to the United States Constitution. God's Center alleges that the LFUCG is using the eminent domain law to infringe on its right of free exercise of its religious beliefs. First, we note that God's Center has not explained how it was treated differently or identified the "other litigants" similarly situated that were accorded different treatment by the LFUCG. As a result, it has not presented sufficient facts to allow appellate review of its disparate treatment argument. In addition, God's Center's constitutional argument is not ripe for review because it was not properly preserved. This argument was raised for the first time on appeal. Generally, this Court will review only issues raised in or decided by the trial court.[38]

In conclusion, we hold that the factual findings of the trial court were supported by substantial evidence and its legal conclusions were correct as a matter of law. God's Center has not shown that the taking of a fee simple interest in the Lyric Theatre property by the LFUCG was not necessary for a valid public use or that the LFUCG did not negotiate the purchase of the property in good faith. Because the LFUCG did not act arbitrarily or in excess of its authority, the trial court did not err in granting the LFUCG's petition for eminent domain.

For the foregoing reasons, the judgment of the Fayette Circuit Court is affirmed.

ALL CONCUR.

---

**38.** *See Regional Jail Authority v. Tackett,* Ky., 770 S.W.2d 225 (1989); and *Swatzell v. Commonwealth,* Ky., 962 S.W.2d 866 (1998).